UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. **03-36974-H2-11** |
| **Golden Oil Company** | § | CHAPTER 11 |
| *a Delaware Corporation* | § | |
| DEBTOR | § | |

**[PROPOSED]**
**THIRD AMENDED AND RESTATED JOINT DISCLOSURE STATEMENT**
**FILED BY DEBTOR GOLDEN OIL COMPANY AND RALPH T. MCELVENNY, JR.,**
**AEROPANEL CORP. AND INSTRUMENT SPECIALTIES CO., INC.**

ON _____ THE COURT APPROVED THIS DISCLOSURE STATEMENT, WHICH RELATES TO THE DEBTOR'S AMENDED AND RESTATED PLAN OF REORGANIZATION. A COPY OF THE PLAN IS INCLUDED HEREWITH AND DESCRIBED IN THIS DISCLOSURE STATEMENT.

**THE PLAN PROPONENTS URGE YOU TO VOTE IN FAVOR OF THIS PLAN.**

LAW OFFICE OF PETER JOHNSON

*/s/ By permission HMR*
_____
PETER JOHNSON, FB NO. 2475
TBA 10778400
Attorney in Charge for Debtor
Eleven Greenway Plaza, Suite 2820
P.O. Box 980877
Houston, Texas 77098-0877
(713) 552-0025
(713) 552-1433 facsimile

PLEASE TAKE NOTICE THAT APPROVAL OF THIS DISCLOSURE STATEMENT BY THE COURT IS NOT A FINDING BY THE COURT THAT THE INFORMATION CONTAINED HEREIN IS ACCURATE OR THAT THE COURT ENDORSES THE ENCLOSED PLAN. RATHER THE COURT HAS APPROVED THE DISCLOSURE STATEMENT AS COMPLYING WITH 11 U.S.C.§1125 AS CONTAINING ADEQUATE INFORMATION AS REQUIRED BY SUCH PROVISION OF LAW.

# TABLE OF CONTENTS

1.  DEFINITIONS ........................................................................................................ 1
    1.1.  Plan Definitions .......................................................................................... 1
    1.2.  Statutory Definitions .................................................................................. 1
    1.3.  Special Definitions. .................................................................................... 1
        1.3.1.  Committee ........................................................................................ 1
        1.3.2.  "Affiliated Entities" ........................................................................ 1

2.  INTRODUCTION ................................................................................................. 1
    2.1.  Purpose of Chapter 11 ............................................................................... 3
    2.2.  Source of Information in Disclosure Statement ..................................... 3

3.  BACKGROUND OF THE DEBTOR ................................................................. 3
    3.1.  The Formation and Ownership of the Company ..................................... 3
    3.2.  Operational History and Financial Distress ........................................... 4
        3.2.1.  The Debtor's Business ...................................................................... 4
        3.2.2.  Business Problems ........................................................................... 4
        3.2.3.  Loans extended by  McElvenny Affiliated Entities ......................... 6
        3.2.4.  Outlook ............................................................................................ 6
    3.3.  Management ................................................................................................. 6
        3.3.1.  Personnel ......................................................................................... 6
        3.3.2.  Salary ............................................................................................... 6
    3.4.  Assets Owned by GOCO ............................................................................ 7
        3.4.1.  Scheduled Assets and liabilities...................................................... 7
        3.4.2.  Subsidiaries and their assets .......................................................... 7
        3.4.3.  Valuation Method and Analysis ...................................................... 7
    3.5.  Accounts Receivable .................................................................................. 8

4.  SIGNIFICANT EVENTS DURING BANKRUPTCY...................................... 8
    4.1.  Voluntary Petition filing............................................................................ 8
    4.2.  Borrowing Motion ...................................................................................... 8
    4.3.  Motion to Employ Special Counsel .......................................................... 9
    4.4.  Pending Litigation ...................................................................................... 9
    4.5.  Motion for Leave to Sue the Debtor's Insiders....................................... 10
    4.6.  Motions to Terminate/Extend Exclusivity .............................................. 10

5.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....................... 10
    5.1.  Cure of Lease and Executory Contract Defaults .................................... 11
    5.2.  Rejected if Not Assumed ........................................................................... 11
    5.3.  Bar to Rejection Damages ......................................................................... 11

6.  CLAIMS ................................................................................................................ 11
    6.1.  Bar Date ....................................................................................................... 11
    6.2.  Scheduled Claims ....................................................................................... 11
    6.3.  Claim Objections......................................................................................... 11
    6.4.  Claims Analysis........................................................................................... 12

7.  APPOINTMENT OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS ................................................................................................................ 12

| 7.1. | Members | 12 |
| 7.1.1. | Nortex Corporation: | 12 |
| 7.1.2. | Energen Resources f/k/a Taurus Exploration USA: | 12 |
| 7.1.3. | George Lotspeich and the MLG ("McKay-Lotspeich Group"), | 13 |
| 7.2. | Committee Counsel | 13 |

8. OPERATIONS DURING BANKRUPTCY ....................................................... 13
| 8.1. | Financial Condition since the Petition Date | 13 |
| 8.2. | Appointment of Professionals and Compensation | 13 |
| 8.2.1. | Attorneys | 13 |
| 8.2.2. | Anticipated Administrative Expenses to be Paid by GOCO | 14 |

9. ANTICIPATED FUTURE OF GOCO ....................................................... 15
| 9.1. | Effect of Reorganization | 15 |
| 9.2. | DISSOLUTION OF THE PARTNERSHIPS | 15 |
| 9.2.1. | Dissolution | 15 |
| 9.2.2. | GOCO is the General Partner of the Partnerships. | 15 |
| 9.2.3. | To Settle with MLG, the Partnerships Must be Dissolved | 15 |
| 9.2.4. | The Partnerships are insolvent. | 16 |
| 9.2.5. | Limited Partners Will Retain Their Individual Working Interests. | 16 |
| 9.2.6. | Termination of Partnership/Working Interest for Nonpayment of Joint Interest Billings... | 16 |
| 9.3. | Merger of Debtor and GOHC | 16 |

10. OVERVIEW OF THE PLAN ....................................................... 17
| 10.1. | Effect of the Plan on the Debtor | 17 |
| 10.2. | Claims to be Served by Plan | 17 |
| 10.3. | Summary of Classification and Treatment of Claims and Interests | 17 |
| 10.3.1. | Allowed Administrative Claims 11 U.S.C. §502(b) | 17 |
| 10.3.2. | Priority Claims (CLASS 1) | 18 |
| 10.3.3. | Claims of Secured Creditors (CLASS 2) | 19 |
| 10.3.4. | Unsecured Claims (CLASS 3). | 21 |
| 10.3.5. | The Stockholders of GOCO (CLASS 4) | 21 |
| 10.3.6. | The MLG Claims, (CLASS 5) | 22 |
| 10.3.7. | Intercompany Claims Between GOCO and GOHC | 22 |
| 10.3.8. | Contested or Disputed Claims | 22 |
| 10.4. | BIA and MMS Claims | 22 |
| 10.5. | MLG Settlement | 22 |
| 10.5.1. | Basis for Compromise. | 23 |
| 10.5.2. | Compromise and Settlement Terms. | 23 |
| 10.5.3. | Authority to Sign Title Transfer Documents on Behalf of Chace. | 23 |
| 10.5.4. | Additional Releases. | 24 |
| 10.5.5. | Relation to Other Creditors. | 24 |
| 10.6. | Release and Discharge | 25 |
| 10.6.1. | Discharge Generally | 25 |
| 10.6.2. | Release Generally | 25 |
| 10.6.3. | Specific Release of claims by Jicarilla Tribe | 26 |
| 10.6.4. | Specific Release of Claims against McElvenny | 26 |
| 10.7. | Modification or Revocation of the Plan | 26 |
| 10.8. | Effective Date | 27 |
| 10.9. | Disbursing Agent | 27 |
| 10.9.1. | Formation | 27 |
| 10.9.2. | Distribution | 27 |
| 10.9.3. | Payments to and From the Disbursing Agent | 28 |

**11.  ACCEPTANCE AND CONFIRMATION OF THE PLAN .......................... 28**
**11.1.  Acceptance of the Plan ........................................................ 28**
**11.2.  Confirmation without Acceptance of All Impaired Classes ................ 28**
**11.3.  Impairment of Claims ........................................................ 29**
**11.4.  Best Interest of Creditors .................................................. 30**

**12.  VOTING PROCEDURES ................................................................ 30**
**12.1.  Who May Vote .................................................................. 30**
**12.2.  Effect of failure to vote .................................................. 31**
**12.3.  Ballot Form .................................................................. 31**
**12.4.  Voting Procedures ............................................................ 31**
**12.5.  Chapter 7 Liquidation Analysis .............................................. 32**
**12.6.  Feasibility of the Plan ...................................................... 32**
**12.7.  Alternatives to the Plan .................................................... 32**
**12.8.  Risk to Creditors if Plan is Approved ...................................... 33**
**12.9.  Benefits and Risks of Chapter 7 ............................................ 33**

**13.  LITIGATION ........................................................................ 33**
**13.1.  Pending Litigation .......................................................... 33**
**13.2.  Anticipated Litigation ...................................................... 34**
    13.2.1.  Unresolved Claims Objections .................................................. 34
    13.2.2.  Litigation against Lotspeich and MLG .......................................... 34
    13.2.3.  Litigation to Avoid Preferences and Fraudulent Transfers ...................... 34
    13.2.4.  Litigation to Collect Amounts Receivable ...................................... 35
    13.2.5.  Special Counsel and Special Oil & Gas & Environmental Counsel .................. 35

**14.  GOVERNMENTAL REGULATION .......................................................... 35**

**15.  SELECTED FINANCIAL DATA .......................................................... 36**
**15.1.  Method of Accounting Used by Debtor ........................................ 36**
**15.2.  Financial Reports ............................................................ 36**

**16.  PREFERENCES AND RECOVERABLE TRANSFERS ............................................ 36**

**17.  AFFILIATES OF THE DEBTOR ........................................................ 37**

**18.  MANAGEMENT OF THE REORGANIZED DEBTOR ............................................ 37**
**18.1.  Restated By-Laws and Articles of Incorporation ............................ 37**
**18.2.  Members of the Board ........................................................ 37**
    18.2.1.  Initial Salary of Officers and Directors ...................................... 37
    18.2.2.  Future Determination of Compensation of Management ............................ 38
**18.3.  Key Employees ................................................................ 38**

**19.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES .......................................... 38**
**19.1.  Tax consequences to the Debtor .............................................. 38**
    19.1.1.  Net Operating Loss and Excess Interest Expense Carryforward of the Debtor ...... 38
    19.1.2.  Realization of Cancellation of Indebtedness Income ............................ 38
    19.1.3.  Limitation to Utilization of NOLs -- Section 382 of the Tax Code .............. 39
    19.1.4.  Dissolution of the Partnerships ............................................... 41

19.1.5.    Alternative Minimum Tax ................................................................................. 41

**19.2.    Tax Consequences to Creditors ............................................................... 41**

19.2.1.    Generally............................................................................................................ 41

19.2.2.    Members of Dissolved Partnerships ............................................................ 41

19.2.3.    Unsecured Claims.............................................................................................. 42

## EXHIBITS TO DISCLOSURE STATEMENT

**Ralph T. McElvenny Information** ................................................................... 3.3.1

**Updated Schedules** ........................................................................................ 3.4.1.2

**Reserve Reports** ............................................................................................ 3.4.3.2

**Accounts Receivable** ..................................................................................... 3.4.3.5

**Monthly Operating Report (Through Feb. 2004)** ..................................... 3.5

**Agreed Order on Postpetition Borrowing** ................................................. 4.2

**Executory Contracts Assumed** .................................................................... 5.1

**Claims Analysis** ............................................................................................. 6.4

**Debtor's Financial Statements (Projection)** .............................................. 9.1

**Chapter 7 Liquidation Analysis** .................................................................. 12.5

# 1.   DEFINITIONS

## 1.1.   Plan Definitions

The Definitions used in the Plan, attached hereto, apply to this Disclosure statement, unless otherwise defined by Paragraph 1.3.

## 1.2.   Statutory Definitions

Definitions used in the Bankruptcy Code (i.e. 11 U.S.C. §101) apply to this Disclosure Statement, unless such definitions conflict with the Plan Definitions.

## 1.3.   Special Definitions.

### 1.3.1.   Committee

Includes all constituent members

### 1.3.2.   "Affiliated Entities"

Is the same as "McElvenny" defined in the Plan, and includes Ralph T. McElvenny, Jr. and affiliated entities, including Aeropanel Corporation and Instrument Specialties Co., Inc. (collectively, the "Affiliated Entities").

# 2.   INTRODUCTION

GOLDEN OIL COMPANY ("Debtor" or "GOCO") joined by Affiliated Entities, submit this Disclosure Statement (the "Disclosure Statement") under 11 U.S.C. § 1125 in support of the Original Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code filed by them (the "Plan"), in connection with the solicitation of acceptances of the Plan under Chapter 11 of the United States Bankruptcy Code.  A copy of the Plan is enclosed herewith for your review.

This Disclosure Statement is being provided in order to disclose important and necessary information to allow a reasonably informed decision by creditors receiving distribution under the Plan to exercise its rights to vote on the Plan.  The purpose of this summary is to answer questions which are most often asked by a party receiving a Disclosure Statement.  Unless otherwise stated, the information contained herein is current as of February 29, 2004, which is at the end of the Debtor's most recently reported accounting period.  The forecasts provided with the Disclosure Statement are figured around that date as well. A term used in this Disclosure Statement and not defined herein has the meaning assigned to that term in either the Plan or the Bankruptcy Code.

In addition to reviewing this Disclosure Statement, all persons receiving the Disclosure Statement are urged to review fully the provisions of the Plan and all attachments to the Disclosure Statement.

This Disclosure Statement is not intended to replace careful review and analysis of the Plan.  Rather, it is submitted as an aid and supplement in your review of the Plan and in an effort to explain the terms and implications of the Plan on file with the Bankruptcy Court.  Every effort has been made to explain fully the various aspects of the Plan as it may affect all creditors

and holders of interest.  If you have any questions, the Debtor urges you to contact Debtor's legal counsel and every effort will be made to assist you.

The Bankruptcy Court entered an order approving the Disclosure Statement as containing information of a kind and in sufficient detail, adequate to enable creditors whose votes on the Plan are being solicited to make an informed judgment whether to accept or reject the Plan.

Creditors should read this Disclosure Statement in its entirety prior to voting on the Plan.  No solicitation of votes on the Plan may be made, except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code.  **No other party has been authorized to utilize any information concerning the Debtor or its affairs, other than the information contained in this Disclosure Statement, to solicit votes on the Plan.**  Creditors and holders of equity interests should not rely on any information relating to the Debtor other than that contained in this Disclosure Statement and the exhibits attached hereto.

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE APPENDIX,  NO REPRESENTATIONS CONCERNING THE DEBTOR, THE ASSETS, THE PAST OPERATIONS OF THE DEBTOR, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.  ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, PETER JOHNSON, ESQ.**

**EXCEPT AS SPECIFICALLY NOTED, THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  THE FACTUAL INFORMATION REGARDING THE DEBTOR, INCLUDING THE ASSETS AND LIABILITIES OF THE DEBTOR, HAS BEEN DERIVED FROM NUMEROUS SOURCES, INCLUDING, BUT NOT LIMITED TO, DEBTOR'S BOOKS AND RECORDS, SCHEDULES AND DOCUMENTS SPECIFICALLY IDENTIFIED HEREIN.**

**THE DEBTOR ALSO COMPILED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT FROM RECORDS AVAILABLE TO IT, INCLUDING, BUT NOT LIMITED TO, PLEADINGS AND REPORTS ON FILE WITH THE BANKRUPTCY COURT, LOAN AGREEMENTS AND BUSINESS RECORDS.**

**THE APPROVAL BY THE BANKRUPTCY COURT OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**NEITHER THE DEBTOR, AFFILIATED ENTITIES, NOR COUNSEL FOR THE DEBTOR CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACIES. NEITHER THE DEBTOR NOR ITS COUNSEL HAVE VERIFIED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, ALTHOUGH THEY DO NOT HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.**

**IF THE REQUISITE VOTE IS ACHIEVED FOR EACH CLASS OF IMPAIRED CLAIMS, THE PLAN IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN), WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

### 2.1.   Purpose of Chapter 11

Chapter 11 is the principal reorganization Chapter of the Bankruptcy Code.  Under Chapter 11, a debtor, such as GOCO attempts to reorganize its affairs.  The formulation of a plan of reorganization or a plan of liquidation is the principal purpose of a Chapter 11 case.  This Plan sets forth the means for satisfying the holders of claims against the debtor.

Confirmation of a plan is necessary for a debtor in Chapter 11 to provide the court-approved treatment to its creditors under its plan. Unless the plan is confirmed, the Debtor is legally prohibited from providing you payments proposed in its plan.

### 2.2.   Source of Information in Disclosure Statement

The information contained in this disclosure statement was collected from the records of GOCO and provided by the members of the Management of GOCO and has not otherwise been the subject of an external audit.

The information contained in the reserve report (exhibit 3.4.3.2) was collected from third-party sources using both their own information and information provided by GOCO.

## 3.    BACKGROUND OF THE DEBTOR

### 3.1.    The Formation and Ownership of the Company

GOCO was formed in 1970 through the acquisition and merger of several entities.  The Debtor is a Delaware corporation that was publicly traded prior to 1997 on the National Association of Securities Dealers Automated Quotation System ("NASDAQ").  The trading market for the Company's Common Stock continued through the facilities of the Over the Counter ("OTC") Bulletin Board market service until 1999, when public trading ceased. The Company traded under the symbol "GOCO."

Ralph T. McElvenny, Jr. is the largest stockholder of GOCO, owning approximately 49% of the outstanding stock, and is the President and Chairman of the Board of Directors.  The remainder of the stock ownership of GOCO is spread between approximately 2,000 equity interest holders.

The Debtor is the parent to two wholly-owned subsidiary corporations, Golden Oil Holding Company, a Delaware corporation ("GOHC") and Golden Resources, Inc., a Delaware corporation ("GRI").   Mr. McElvenny acts as both President and Chairman of both GOHC and GRI.  A chart depicting the corporate structure of the Debtor and its subsidiaries is attached hereto as Exhibit "3.1."

### 3.2.    Operational History and Financial Distress

#### 3.2.1.   The Debtor's Business

The Debtor operates oil and gas wells for several limited partnerships in which it is the General Partner.  It also operates oil wells for joint ventures and individual working interest holders of the Debtor.  The Debtor's operations are based on industry standard operating agreements.  The Debtor also holds interests in wells as the result of "farmout agreements" from lessors, who do not operate the wells.

In the course of operating wells, the Debtor performs services and re-works wells.  The costs are charged back to the partnership or interest holder through "joint interest billings".

Some of these operations are on lands owned by the Jicarilla Apache Nation ("Jicarilla")[1]. The Debtor's primary source of revenue in recent years has been derived from operating the wells, the sale of oil and gas, and distributions from its subsidiary, GRI.

The Debtor's business is to produce the oil and gas from the well, many of which are "stripper wells" and sell the gas to purchasers at market value.  The nature of a "stripper" well is that the well must operate nearly continuously with a pump-jack, else it risks long-term well bore formation damage and loss of overall production capacity.  The Debtor, therefore, produces at low volumes, less than ten barrels a day in certain cases.  The Debtor may operate a well at a loss for a period of time in order to preserve future production.   For instance, during the oil and gas price collapse in 1998, the Debtor produced oil from the ground at a cost of $14 a barrel (lifting costs), but the market price available for its oil production was as low as $8.50 a barrel.  During this time, holders of working interests and partnership interests were placed "in suspense".  Their interests were charged pro-rata for the losses each well was incurring and they received no production payments.  During this time the interests were "in suspense" the Debtor was able to borrow over $900,000 from Mr. McElvenny and Affiliated Entities, who paid for the expenses.

#### 3.2.2.   Business Problems

As described above, the Debtor faced a recent history of problems that severely reduced the revenues available for operation.  The problems come primarily in the difficulty of maintaining and operating the New Mexico Wells on the Jicarilla lands and with the financial burden of keeping such wells in production during the oil and gas price collapse which began in 1998; the double-taxation resulting from taxes imposed by both the Jicarilla Apache nation and the State of New Mexico; the special environmental costs required by the Jicarilla nation to close and remediate all "open pits" on the reservation.  The Debtor's historical financial problems are summarized as follows:

---

[1]   The Jicarilla Apache Nation is comprised of approximately 2,600 members, many of who reside on the Nation's Reservation in the San Juan Basin in New Mexico.  The Jicarilla tribe asserts certain of its own rules and laws on oil and gas operations.  Additionally, the Department of the Interior and Bureau of Indian Affairs provide assistance and oversight in managing the mineral resources and lands.  Some significant difficulties have been encountered in the past by GOCO in regard to its operation on the Jicarilla lands, which make these operations different and in some cases more difficult than conventional oil and gas operations.

### 3.2.2.1.*Oil Prices Collapsed*

- The general oil and gas price collapse in 1998 caused the Debtor to be unable to produce product at a profit and pay bills. Specifically, the cost of operating the New Mexico Wells exceeded the revenues produced and the interest owners were placed "in suspense";

- Double Taxation: The Costs of doing business on the Jicarilla Reservation decreased profitability of the well. Wells on Indian lands are subject to taxation from both State and Tribal taxing systems. As a result, the Debtor's overall Net Revenue Interest in the New Mexico wells is only approximately 56%. Based on industry standards, a net revenue interest for this highly taxed and burdened stripper- production should produce at higher levels to be economically viable.

### 3.2.2.2.*The Computer System Crashed*

- At the end of the year 2000, the J.D. Edwards computer program utilized by the Debtor was unable to continue to output financial reports, including oil and gas operations reports to New Mexico Well interest holders. This system would not produce reports when a post-y2k date was input into the system. After eighteen months of attempted resolution of the problem, the computer consultants determined that the systems could not be economically updated and recommended that a new system be purchased and installed. On advice from professionals, the Debtor installed a new system at the cost of approximately $225,000 and completed system conversion in the first quarter of 2003.

### 3.2.2.3. *Tribal Tax Dispute*

- Disputes with the Jicarilla created another impairment in the operations of the New Mexico Wells when the Jicarilla Oil and Administration Office issued a shut-in order on the New Mexico Wells in January 2002 over a dispute concerning environmental remediation and payment of royalties and Tribal taxes owed. Although an agreement was reached, there were intervening management changes within the tribe which delayed reopening the field for a month. The field eventually reopened after tribal inspections in February of 2002. The shut-in (exacerbated by a blizzard) caused GOCO to incur approximately $250,000 in unreimbursed costs.

### 3.2.2.4.*Remediation Required by Jicarilla*

- Additional costs were incurred when the Jicarilla ordered that all open pits on well sites be remediated. The remediation order issued at a time of falling petroleum prices put a severe burden on GOCO, which did not own the land or the mineral lease, but it was merely the operator of the wells. Nonetheless, GOCO remediated the pits at all of its producing New Mexico wells, and in December 1999 the Jicarilla issued an all-clear order. This remediation cost GOCO over $400,000.

### 3.2.2.5. NGFC Diversion of Funds

•     The Debtor suffered a loss of approximately $150,000 when its contracted sales agent, Natural Gas Fuels Corporation, diverted product to an entity known as Golden Prairie Resources[2] which promptly filed bankruptcy (*GPR Holdings, LLC, Case 01-36736, Northern District, Texas*).

As a result of the continuing costs incurred in operation of the New Mexico Wells and inability to report to its interest and royalty owners, GOCO has been overburdened by litigation primarily from working interest holders in the New Mexico Wells who failed to receive statements prior to 2003 and therefore had limited knowledge of the costs attributed to the New Mexico Wells.

### 3.2.3.  Loans extended by  McElvenny Affiliated Entities

A substantial amount of the money used to pay the above costs, and to cover shortfalls of revenue, was borrowed from Mr. McElvenny and Affiliated Entities, who loaned GOCO in excess of $1.2 Million.  Mr. McElvenny (and his affiliated entities) took a security interest in all of the Debtor's assets.  Due to a clerical error, one document evidencing the security interest as to the Jicarilla reservation was not filed in the proper jurisdiction until shortly before the bankruptcy.  However, the security interest in the Debtor's subsidiaries, GOHC and GRI, was believed timely and properly perfected.

### 3.2.4.  Outlook

Most of the major operational problems have now been solved, and the New Mexico Wells currently produce positive revenues for the interest and royalty owners.   Interest and partnership holders are being charged for their share of the costs attributable to the operations.  However, most of the charges billed in joint interest billings have not been paid current.

### 3.3.    Management

#### 3.3.1.  Personnel

GOCO is managed by the Company's management team; which includes Mr. McElvenny, the CEO/shareholder and principal; Mr. Theodore D. Oldham, who provides both geology and engineering management for oil and gas assets; Mindy Billon, along with others, who provide accounting services. All members have above average industry and general business knowledge and experience.

The qualifications of Mr. McElvenny to act as principal are attached as Exhibit 3.3.1

#### 3.3.2.  Salary

The Management Personnel other than Mr. McElvenny receive regular salaries of less than $80,000 respectively.  Mr. McElvenny receives a total salary of $144,000 for management of Golden Oil.

---

[2] Golden Prairie Resources is unrelated to GOCO and its officers and directors.  In fact, GOCO has filed suit to recover this loss against Natural Gas Fuels Corporation.

### 3.4.    Assets Owned by GOCO

#### 3.4.1.   Scheduled Assets and liabilities

##### 3.4.1.1. *Original Schedules*

The original schedules filed by the Debtor were based on information obtained from the nascent computer system.   Having the information more accurately developed, and with consultation of counsel, several updates and/or corrections were necessitated.   These specifically include identifying partnerships, as opposed to the representative partnership members, as debtors and creditors of the estate.

##### 3.4.1.2. *Updated Schedules*

The Debtor has thus corrected its schedules of assets and liabilities as the result of its updated computer system that allows for accurate tracking of expenses and revenues. Accordingly, the Debtor's corrected Schedule of Assets and liabilities is attached as Exhibit 3.4.1.2.

These corrected schedules were filed with the Court on December 1, 2003.

#### 3.4.2.   Subsidiaries and their assets

The Debtor owns stock in two subsidiaries, GRI and GOHC. One Subsidiary, GRI, is both the owner and operator of approximately 40 oil and gas wells located in the State of Oklahoma.

Prior to March 2003, GOCO was the operator of the New Mexico Wells and, by virtue of an agreement with the Jicarilla tribe, full responsibility for operating the New Mexico Wells was transferred to GOHC.   During the course of the Bankruptcy, GOCO and GOHC re-conveyed the operations of the wells, to consolidate operations and simplify the bankruptcy.   GOHC, as of this disclosure statement, has no tangible assets or receivables.

The Debtor summarily describes its assets on the *pro forma* financial statements attached as Exhibit 9.1 below.

#### 3.4.3.    Valuation Method and Analysis

##### 3.4.3.1. *Physical Assets*

The physical assets of the Debtor (equipment, furniture, office equipment) are valued at orderly liquidation value.

##### 3.4.3.2. *Oil and Gas Leases*

The value of the Oil and Gas Leases is established by the Reserve Report attached as Exhibit 3.4.3.2, which was compiled by a third party employed for that purpose.

##### 3.4.3.3. *Litigation*

The Litigation assets are not valued on the pro forma financial statements, but (described at expected good faith settlement value, not demand) total over $90,000 for the NGFC suit and an unknown amount for a potential suit against Chace Oil, Lotspeich, and others (referenced in the Plan as "MLG", a list of the participants of whom may be obtained by written request to their

counsel Pete Domenici, Jr. at Dolan & Domenici, 6100 Seagull St. NE, Suite 205, Albuquerque NM 87109).  After extensive negotiation, the Debtor and MLG have reached an agreement to finally compromise their disputes upon approval of the signed Settlement Agreement, as described in the Plan and herein.

### 3.4.3.4. GRI Stock

GRI's stock is valued at the value of its assets, namely, oil and gas wells, as a going concern.

### 3.4.3.5. Accounts Receivable

The Accounts Receivable are mostly past due as a result of the nature of the account. They are, in large part, amounts owed by working interest and limited partnership holders. Attached as Exhibit 3.4.3.5 is the listing of working interest accounts receivable.

### 3.5. Accounts Receivable

GOCO has commenced an aggressive campaign to collect accounts receivable since the filing of the petition under Chapter 11.  Attached hereto as Exhibit 3.5 is the most current operating report filed by GOCO, which provides that the total outstanding accounts receivable were $967,904.44.  These receivables were generated from prior operations of GOCO relating to the New Mexico Oil and Gas Wells, and particularly for the advance of funds needed to operate the field.  Unfortunately there was a significant delay (due to the computer programming update requirement) in invoicing the partnerships and interest holders of the Oil and Gas properties that the Debtor operated on their behalf.

With the new system installed and the accounting and Joint Interest Billings brought current, GOCO mailed statements to all working interest holders in March 2003 that detailed the operation and charges to each interest.  GOCO is unaware of any valid defenses to the collection of the receivables and/or the forfeiture of interest in wells or partnerships which do not pay. GOCO has continued to attempt to collect these receivables during the bankruptcy proceeding, and has arranged for payment and compromise of certain significant receivables through the settlement agreement with MLG (subject to court approval).

### 4. SIGNIFICANT EVENTS DURING BANKRUPTCY

### 4.1. Voluntary Petition filing

On May 12, 2003 GOCO filed this voluntary bankruptcy case under Chapter 11 of the Bankruptcy Code and was assigned Case No. 03-36974-H2-11 in the Bankruptcy Court for the Southern District of Texas.

### 4.2. Borrowing Motion

Prior to the filing of the bankruptcy case, GOCO granted liens on virtually all of its assets to secure the repayment of debt incurred when the company operated but did not bill the interest

holders for the costs of operations.[3]   The State of New Mexico ("New Mexico") also asserts a secured claim in the amount of $225,575.30 secured by the Oil and Gas properties located in New Mexico.   Although the value of the McElvenny and New Mexico collateral likely exceeds the outstanding debt of those entities, bankruptcy law prohibits the use of the cash proceeds of collateral such as accounts receivable without either the permission of the creditor or an order of the bankruptcy court finding that the creditor will be adequately protected and not suffer further damage by loss of collateral value.   McElvenny gave permission to GOCO to use cash collateral. However, the cash available to GOCO was very limited for the reason that certain wells operated by the Debtor were in critical need of workover and most working interest costs had not been paid.

Since GOCO had no other source of operating capital, it filed a motion with the bankruptcy court seeking authority to borrow additional funds from Mr. McElvenny and Affiliated Entities and grant post-petition liens on its assets to allow sufficient funds to complete the workovers and pay administrative costs of operating the Chapter 11 case.   Additionally, as the owner of a working interest in the wells, any failure of GOCO to fund the workovers could result in either loss of the interest or significant penalties provided by the operating agreements.

The Committee objected to the proposed borrowing on any basis that would guarantee Mr. McElvenny a secured lien.   The parties compromised their dispute, allowing Mr. McElvenny to loan money post-petition and receive priority and super-priority rights, as set forth in the terms of the Agreed Borrowing Order attached as Exhibit 4.2.

### 4.3.    Motion to Employ Special Counsel

Prior to the filing of the bankruptcy case, GOCO was involved in several litigation matters in both the State of New Mexico and the State of Texas.[4]   Bankruptcy law requires approval of the court before a debtor is authorized to engage certain professionals, such as special litigation counsel.   The Debtor filed such an application to employ Jeffrey R. Koch, Esq., Shannon, Martin, Finkelstein & Sayre, 2400 Two Houston Center, 909 Fannin Street, Houston, Texas 77010, to serve as special counsel to investigate and pursue both pending litigation and potential actions to recover for the creditors of the estate.   The Debtor has sought authority to employ a second special counsel, Andrew Strong, Esq. of Campbell George & Strong, P.C., for the purpose of assisting with environmental and engineering, civil litigation (including litigation against members of MLG, to resolve issues related to the New Mexico wells.

### 4.4.    Pending Litigation

Specifically, the following litigation was pending at the time of the Debtor's bankruptcy filing:

---

[3]   The schedules show that McElvenny was owed $934,921.07 at the time of the filing.  However, the Committee has challenged the technical compliance with the perfection of liens asserted by McElvenny as to the New Mexico costs.  Additional funds have been loaned by Mr. McElvenny during the pendency of the Bankruptcy, and these are given statutory priority and/or a super-priority lien in all of the Debtor's assets, in cluding the disputed New Mexico wells.  There does not appear to be any question regarding the advance of the funds, only regarding the amount of the claim that would be considered secured by GOCO's New Mexico assets.

[4]   See Section 4.4 for detail regarding the litigation.

*Elliott S. Slusky and Harvey E. Slusky vs. Golden Oil Company Cause #: D-0117-CV-2000-00819 First judicial District Court, State of New Mexico, County of Rio Arriba.*

*Matteucci, et al vs. Golden Oil Company,Cause #: D-0117-CV-2002-01924, First Judicial District Court, State of New Mexico,County of Rio Arriba.*

*EOG Resources, Inc. vs. Golden Oil Company, Cause #: D-101-CV-2002-02733, First Judicial District Court, State of New Mexico,County of Rio Arriba.*

*Golden Oil Company vs. Natural Gas Fuel Company, Cause #: 2002-30405, 11th Judicial District Court, State of Texas, County of Harris.*

*Nortex Corporation vs. Golden Oil Company, Cause #: 2001-60688, 295th Judicial District Court, State of Texas, County of Harris.*

### 4.5.    **Motion for Leave to Sue the Debtor's Insiders**.

The Official Committee of Unsecured Creditors asked the Court for permission to sue Mr. McElvenny, because he allegedly received a lien that constitutes a fraudulent transfer or preference.  If such motion were successful, Mr. McElvenny would not be a secured creditor with respect to his pre-petition loans, and would instead be considered an unsecured creditor (as to the New Mexico wells on Apache land only).  However, Mr. McElvenny, in this Plan, has agreed to subordinate his claim to *below* that of the unsecured creditors.  Thus, the motion is put on hold. Other persons would have also been the subject of suit by GOCO, including members of the MLG, third parties and Affiliated Entities as set forth in Section 13.2.2.  The Plan will release and bar any such suit.

### 4.6.    **Motions to Terminate/Extend Exclusivity**

During the 120 day period in which it has the exclusive ability to propose a plan, the "Exclusivity Period", the Debtor was unable to propose a consensual plan of reorganization.   The Creditor's Committee believed that the Exclusivity Period should be terminated to allow them to formulate a liquidating plan.  The Debtor argued that it was acting in good faith to confirm a plan. The Bankruptcy Court has authorized a limited extension of the Exclusivity Period until March 22, 2004.

### 5.    **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The Bankruptcy Code allows the Debtor to assume or reject lease agreements and executory contracts.  An "Executory Contract" is commonly defined as one with obligations remaining on both sides such that the nonperformance of one excuses performance of the other. Additionally, the law provides that the Debtor can assign its interest in lease agreements and executory contracts provided it cures all defaults and provides adequate assurance that the assignee will comply with the terms of the lease or contract.  To the extent that the Debtor is a party to any agreements that relate to its Oil and Gas operations that are determined to be either executory or unexpired leases, it has elected to assume such agreements.

### 5.1.    Cure of Lease and Executory Contract Defaults

To the extent that a default exists, either pre-petition or post-petition, the Debtor shall cure the default in working interests, leases and executory contracts assumed under the Plan by paying the amount of any such cure as a Class 3b Claim.

The Executory Contracts are listed on Exhibit 5.1 attached hereto, along with the cure amounts and a description of the contract.  The Plan shall be treated as a motion to assume these contracts.

### 5.2.    Rejected if Not Assumed

All contracts listed in Exhibit 9.3 attached to the plan are deemed rejected on the Effective Date.  The Plan shall be deemed to constitute and incorporate a motion by the Debtor to reject all executory contracts and unexpired leases to which a Debtor is a party or otherwise bound, except for the contracts and leases that (a) have been assumed, assumed and assigned, rejected or consensually terminated pursuant to an order of the Court entered prior to the Effective Date, (b) are specifically treated otherwise in the Plan (or are listed in Exhibit 9.3), or (c) are the subject of a motion to assume or assume and assign that is pending before the Court on the Effective Date. The Confirmation Order shall represent and reflect an order of the Court approving the assumptions and rejections as of the Confirmation Date.

### 5.3.    Bar to Rejection Damages

If the rejection of an executory contract or unexpired lease by the Debtor results in damages to the counterparty to such contract or lease, a Claim for damages shall be forever barred and shall not be enforceable against the Debtor, its successors and assigns or its property, unless a proof of claim is filed with the Court and served in accordance with Section 9.3 of the Plan by thirty (30) days after entry of the Confirmation Order or by such earlier date as may be fixed by an order of the Court authorizing rejection of the contract or lease. Claims for damages from the rejection of any such leases and contracts, if allowed, shall constitute Class 3a Unsecured Claims entitled to share Pro Rata with other Allowed Class 3a Unsecured Claims.

## 6.    Claims

### 6.1.    Bar Date

The Bankruptcy Court established October 6, 2003 as the last date to file proofs of claim (the "Bar Date") in this case.  The same order provides that claims filed after the Bar Date would not share in distributions from the Debtor estate.

### 6.2.    Scheduled Claims

Pursuant to Rules of Bankruptcy Procedure, a claimant need not file a proof of claim unless their claim is scheduled as disputed, contingent or unliquidated.  However, if it is scheduled by GOCO as disputed, contingent or unliquidated, the claim will be disallowed unless a written proof of claim is timely filed with the Court.

### 6.3.    Claim Objections

The Debtor will object to claims that it believes it does not owe in the amount or priority claimed.  The effect of a "claim objection" is similar to a law suit.  A Proof of Claim is presumed

valid until the objection is filed and evidence is presented to rebut that presumption, at which time the creditor bears the burden of proving the validity of the claim.

### 6.4.    Claims Analysis

The Debtor has analyzed the claims on file and determined that several are overstated or otherwise objectionable.  Accordingly, the Debtor will object to the claims shown on Exhibit 6.4. The Reorganized Debtor or Plan Proponents may object to any claim at any time.  EOG Resources believes that the Plan is acting as a substitute for claim objections, but the Debtor disagrees.  Specifically, the Debtor or Plan Proponents will object to the claims separately, and not by using the plan.

### 7.      Appointment of Official Committee of Unsecured Creditors

Under the Federal Rules of Bankruptcy Procedure, the office of the United States Trustee (as subdivision of the United States Department of Justice) oversees Chapter 11 proceedings and is authorized to designate and appoint an official committee of creditors ("Committee").  In this case, the United States Trustee appointed the following three (3) creditors to the Committee:

### 7.1.    Members

#### 7.1.1.    Nortex Corporation:

A working interest holder and an overriding royalty interest holder in certain wells previously operated by GOCO with an alleged claim of $250,000.  The Debtor has scheduled Nortex as holding an undisputed working interest unsecured claim in the amount of $65,098.79 and an overriding royalty claim in a disputed amount of $162,034.80.

#### 7.1.2.    Energen Resources f/k/a Taurus Exploration USA:

An overriding royalty interest holder in certain wells operated by GOCO with a scheduled claim in a disputed amount of $55,704.25.  Energen has claimed that it is entitled to 18% interest on its prepetition claim as a statutory penalty.  The Debtor does not believe this penalty is owed. Energen has claimed  that there is not sufficient cash on the Plan's effective date to satisfy the claims owed on that date.  However, the Debtor disagrees and believes that $350,000 additional cash put forward by Mr. McElvenny and his affiliates will, in addition to cash on hand, satisfy any obligations that must be satisfied on the effective date.

Energen has also objected that the claims against the estate are greater than anticipated by the Debtor, and that some of these claims are administrative  claims which could not be satisfied. However, the Debtor's position is that the claims are accurately described, and that objections have (or will be) filed to deal with objectionable claims.  Energen alleges that "there is no support" for the contention that the Debtor is owed money from working interest owners, and that there is a potential that the Debtor is in post-petition default.  The Debtor strenuously disagrees with this contention, and would point out that it can accurately account for the amounts owed to it, and that there are no postpetition defaults.  The Debtor also believes it has correctly disclosed the lien rights of claimants, a claim that Energen disagrees with.

**7.1.3.** George Lotspeich and the MLG ("McKay-Lotspeich Group"),

These persons are Partnership and working interest holders in certain wells operated by GOCO. The Debtor and MLG have been in contentious litigation for years. Mr. Lotspeich was employed as president and Director of Chace Oil Co., Inc., which was terminated as operator of the New Mexico Wells after the Debtor purchased MLG's interests in the wells from Chace. After termination, MLG spent years in litigation with the Debtor. The Debtor and MLG have entered into a Settlement Agreement, to be approved by the Bankruptcy Court, which will settle the foregoing dispute and any other litigation between MLG, the Debtor and Affiliated Entities. A list of the individual members of the MLG is available by writing their counsel, Pete Domenici, Jr. at 6100 Seagull St. NE, Suite 205, Albuquerque NM 87109.

## 7.2. Committee Counsel

The Committee engaged the law firm of Heller, Draper, Hayden Patrick & Horn, LLC of New Orleans, Louisiana to represent its interests in the case. Under bankruptcy law, the estate may be responsible for payment of the reasonable fees and expenses of such counsel. Under the Settlement Agreement between MLG and the Debtor, MLG agrees to pay $25,000 of Committee Counsel's allowed expenses (which payment may be made "in kind"). The Committee Counsel specifically objects to this treatment and states that he is entitled to be paid 1) in full and 2) on the effective date the amount of his allowed administrative claim, if any. He has already filed for an administrative claim of approximately $110,000.00 – to which the Plan Proponents intend to object.

## 8. OPERATIONS DURING BANKRUPTCY

### 8.1. Financial Condition since the Petition Date

GOCO has operated its business affairs as Debtor-in-Possession since the entry of an order for relief under Chapter 11, but has not made any extraordinary disposition or acquisition of assets since that date. Attached hereto as Exhibit 8.1 is a copy of the most recent Debtor's Monthly Operating Report filed with the United States Bankruptcy Court for the period ending February 29, 2004.

### 8.2. Appointment of Professionals and Compensation

During the bankruptcy process, the employment of professionals by a Debtor-in-Possession is restricted by the provisions of 11 U.S.C. §327 and requires Court authority to employ and compensate such professionals. In this proceeding it has been necessary for the Debtor to employ professionals to assist with its legal matters. In this bankruptcy case, GOCO engaged the following professionals:

#### 8.2.1. Attorneys

***Law Offices of Peter Johnson.*** Prior to the entry of the Order for Relief in this case, GOCO engaged Peter Johnson, Esquire to provide legal services during the Chapter 11 entity as its general bankruptcy counsel. During the year prior to the filing of the bankruptcy case GOCO paid $30,000 to Johnson for legal services. Additional fees of approximately $30,000 have been billed and an additional $5,000 has been paid.

*Jeffrey R. Koch, Esq, Shannon, Martin, Finkelstein & Sayre.*   GOCO has requested that the court allow the engagement of special litigation counsel to pursue and defend litigation.  GOCO paid advances fees of $15,000 to *Shannon, Martin, Finkelstein & Sayre* and has agreed to pay such additional fees as are incurred in completion of such litigation which may continue subsequent to the closing of the bankruptcy case.  It is anticipated that GRI will contribute to the payment of the fees to this professional, since much of the litigation will be pursued jointly by GOCO and the non-debtor GRI.

*Andrew Strong*.   The Debtor intends to employ Campbell, George & Strong as special counsel to assist in litigation relating to either environmental or oil and gas issues, including those issues in New Mexico relating to the cement job.  The Debtor has paid a $10,000 retainer to Campbell, George & Strong.

*Committee Counsel.*   The Committee has employed counsel for the purpose of evaluating its claims and rights.  It is anticipated that the Committee Counsel's role shall cease upon plan confirmation.

### 8.2.2.   Anticipated Administrative Expenses to be Paid by GOCO

#### 8.2.2.1. *Debtor's Counsel*

The Plan provides that professional fees and expenses incurred after the confirmation of the Plan will be the responsibility of the Reorganized entity.  It is anticipated that professional fees for consummation of the Plan will be approximately $15,000.  Additionally, GOCO shall be required to continue to pay quarterly administrative fees to the office of the United States Trustee until a final decree is entered in the case.  These fees do not require court approval, but are required to be paid by applicable law which sets the rate.  Current expenditures for the Debtor's legal fees and administrative expenses are outlined in the most current Monthly Operating Report attached as Exhibit 3.5.

#### 8.2.2.2. *Committee Counsel*

The Committee Counsel estimates that its costs through confirmation are $120,000.  This estimation is based on the Committee Counsel's current expenditures and anticipated future expenditures.   In the Settlement Agreement between MLG and the Debtor, the parties agreed that Committee Counsel's fees and expenses may be objectionable, or fail the *Johnson* factors.  Thus, MLG has agreed to pay $25,000 of the Committee Counsel's Allowed Claim, and the Debtor has agreed to pay up to $75,000 of the Committee Counsel's Allowed Claim.  However, the Committee Counsel specifically does not accept his treatment.  The Plan Proponents intend to object to the administrative claim of Committee Counsel.

#### 8.2.2.3. *Operating Expenses*

The Debtor must pay Operating Expenses on a going-forward basis.  Currently, the Debtor is cash-flow positive and able to fund the operating expenses from its current operations.  The Debtor's projected financial statements (including cash flow and expenses) are attached as Exhibit 9.1 below.

### 8.2.2.4. *Experts/ Independent Accountants*

The Debtor has employed certain accountants and experts to assist in Oil and Gas, environmental and other litigation and/or research, whose fees are anticipated to be approximately $25,000.  The Debtor was required by the Committee to employ an independent accountant to prepare financial statements.  Michael Luttrell has billed approximately $18,000 out of the $25,000 for his services assisting the Debtor in preparations of pro forma statements, and other accounting.

## 9.     ANTICIPATED FUTURE OF GOCO

### 9.1.    Effect of Reorganization

The Debtor expects to implement its plan and continue on its business restructure that should provide growth and full compliance with the plan.  Attached hereto as Exhibit "9.1" is a financial projection prepared by Michael Luttrell, CPA of Synergies Consulting Co. with the cooperation of and information from management, that projects the status of assets, liabilities, income, expense and other provisions for payment of creditor claims under the plan.  Working Interest owners will continue to have amounts charged to their accounts that are "in suspense".  It is anticipated that interest owners who are sued or threatened with collection suits will abandon their unprofitable interests as set forth in the Plan, thus reducing the burden on the going-forward profitability of the Debtor.  This exhibit 9.1 has been revised to account for changes to the Debtor's assets and liabilities and financial condition as a result of the MLG Settlement and payment to Class 5 claimants.

### 9.2.    DISSOLUTION OF THE PARTNERSHIPS

#### 9.2.1.  <u>Dissolution</u>.

On the Effective date, the Partnerships will be dissolved and each limited partner who has paid all capital contributions or working interests assessed by the Debtor or reorganized Debtor (or commenced timely arbitration in lieu of payment) shall receive a working interest in each well equal to their respective share of the partnership's interest.

#### 9.2.2.  <u>GOCO is the General Partner of the Partnerships</u>.

As such, GOCO is liable for each of the partnership debts (prior General Partners may be liable) .  Thus, dissolving the Partnerships does not, in and of itself, remove any of GOCO's obligations to the Partnerships' creditors.  The terms of each partnership agreement are nearly identical, and authorize each Partnership to conduct every lawful business activity.  Each Partnership can, therefore, invest in the other Partnerships.  For over 15 years, well before GOCO became general partner, the general partner of these Partnerships had a process of "netting" each limited partner's income and expenses between the various Partnerships.  Only recently was this practice questioned by MLG.  The Debtor maintains that this practice is standard in a common industry practice.

#### 9.2.3.  <u>To Settle with MLG, the Partnerships Must be Dissolved</u>

MLG, in the settlement, will convey its interests in certain wells to the Debtor, and the Debtor will convey certain of its interests in wells to MLG.  However, those interests are

technically Partnership interests.   Rather than enter into 25 new inter-partnership transfer agreements, the Partnerships (which were ignored for purposes of distribution for the past 25 years), should be dissolved as a matter of convenience to all parties. MLG and GOCO have agreed to the dissolution of all Partnerships having any interest in Section 71 and Section 363 Leases as a term of their settlement.

### 9.2.4.   **The Partnerships are insolvent**.

The Partnerships are, on the whole, insolvent and unlikely to receive additional contributions of capital.  The limited partners of each Partnership are not required to make additional contributions of capital.

### 9.2.5.   **Limited Partners Will Retain Their Individual Working Interests**.

Upon dissolution, each limited partner of the Partnerships will receive a working interest in each well held by the partnership, in an amount equal to their participation in the partnership. For example, if the partnership held three wells, a 25% working interest in one, a  75% working interest in another, and a 100% working interest in the third, a limited partner with a 10% interest in the partnership would receive 2.5 % working interest in the first well, 7.5 % working interest in the second well, and a 10% working interest in the third well.

### 9.2.6.   **Termination of Partnership/Working Interest for Nonpayment of Joint Interest Billings**.

GOCO, as the general partner of each Partnership, may require its limited partners to contribute capital.  GOCO billed limited partners, but they have failed to pay.  Under the terms of the relevant Partnership Agreements and Operating Agreements, those partnership or working interests are subject to termination, forfeiture and relinquishment to GOCO after nonpayment. Under paragraph 6.3 of the Plan, the partnership interest or working interests unpaid after demand are deemed to be property of the Reorganized Debtor, under the procedures set forth therein. All such interest in wells located on the Sections 71 and 363 Leases shall be deemed transferred to MLG pursuant to the terms of the Compromise set forth in §10.5 herein.  Under the Plan, and in accordance with the terms of the operating agreements, the Debtor will take action to obtain the working interest if money is owed but not paid.  The determination of whether there is money owed or paid and how an interest is obtained  is, of course, determined by the operating agreement and applicable law.

### 9.3.   **Merger of Debtor and GOHC**

In the Course of confirming this Plan, there will be a substantive merger of GOHC and the Debtor, and all assets and liabilities of GOHC shall be dealt with as liabilities and assets of the Debtor.  As the only known liabilities of GOHC are to the Debtor, the distribution to unsecured creditors will not change.

## 10.    OVERVIEW OF THE PLAN

### 10.1.    Effect of the Plan on the Debtor

The Plan will have the effect of significantly improving the recovery chances of all creditors.   The Plan provides for a restructure of the secured debt, the full payment of tax obligations, and the full payment of unsecured creditor claims from a quarterly disbursing account funded by revenue deposits by the Reorganized Debtor, all of the accounts receivables, and proceeds of litigation.  In the Plan, the current equity will be cancelled and Mr. McElvenny and the Affiliated entities, as secured creditors, agree to subordinate their rights to payment of over $1.2 Million.   Liabilities for taxes, royalties and abandonment costs associated with wells on the 71 Lease and 363 Lease will be assumed by MLG, in exchange for a mutual release of liability between the Debtor, Affiliated Entities, and MLG, and the transfer of all MLG's interests in other leases to the Debtor.  A copy of the proposed Plan is enclosed with this Disclosure Statement and the provisions of that Plan will control over the explanation in the following summary.

### 10.2.   Claims to be Served by Plan

GOCO believes that the following are claims that are to be served by the Plan:

| CLASS | CREDITORS |
|---|---|
| 1 | PRIORITY TAX CLAIMS OF IRS, HARRIS COUNTY, CITY OF HOUSTON AND HISD |
| | PRIORITY TAX CLAIM OF THE STATE OF NEW MEXICO |
| 2 | SECURED TAX CLAIM OF THE STATE OF NEW MEXICO |
| 2 | SECURED CLAIM OF McELVENNY |
| 3a | GENERAL UNSECURED AND LIMITED PARTNERSHIPS |
| 3b | ELECTION OF WORKING INTERESTS AND JOINT VENTURERS |
| 3c | ELECTION OF THE OVERRIDING ROYALTY INTEREST HOLDERS |
| 3d | UNSECURED TRADE CLAIMS |
| 4 | STOCKHOLDERS |

### 10.3.   Summary of Classification and Treatment of Claims and Interests

#### 10.3.1.  Allowed Administrative Claims 11 U.S.C. §502(b)

Administrative Expenses are Claims against the Debtor constituting a cost or expense of administration of this Case allowed under Bankruptcy Code § 503(b), including any actual and necessary costs and expenses of preserving any of the estates of the applicable Debtor, any actual and necessary costs and expenses of operating the Debtor's business, any allowance of compensation and reimbursement of expenses of Professionals to the extent allowed by the Court and certain other amounts as set forth in the Plan. The Bankruptcy Code does not require Administrative Expense Claims to be classified under a plan. It does, however, require that Allowed Administrative Expense Claims be paid in full in Cash in order for a plan to be confirmed, unless the holder of such Claim consents to different treatment.

##### 10.3.1.1. *Generally*

Pursuant to the Plan, each Allowed Administrative Expense Claim will be paid in respect of such Claim in Cash, in full, on or promptly after the Effective Date, or, if such Claim has not been Allowed on or before the Effective Date, promptly after the Claim is Allowed by a Final Order, or as otherwise due by agreement of the parties; provided, however, that an Allowed Administrative Expense Claim may be satisfied on such other terms as may be agreed to by the holder of such Claim and the Debtor.

### 10.3.1.2. *Ordinary Course Business Expenses*

Certain administrative claims have been paid during the course of this Case. Notwithstanding anything to the contrary, Administrative Expenses related to Debtor's ordinary course of business (including amounts owed to vendors and suppliers that have sold goods or furnished services to the Debtor after the commencement of these Cases) will continue to be paid by the Debtor during the Case in accordance with the terms and conditions of the particular transactions and any agreement or Court order relating thereto.

### 10.3.1.3. *Ordinary Course Business Liabilities*

Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor shall be paid in accordance with the agreed terms between the parties.

### 10.3.1.4. *Administrative Claims Bar Date*

The Plan provides for an administrative bar date for claims against the Debtor not covered by previous bar dates that falls 30 days after the Effective Date of the Plan. All unpaid Administrative Expense Claims arising on or before the Effective Date shall be filed with the Court and served on Debtor's counsel in accordance with the Plan or any other applicable order of the Court or be forever barred.

### 10.3.1.5. *Professional Fees*

There is a separate procedure for professional fee and expense applications.
.

## 10.3.2. Priority Claims (CLASS 1)

### 10.3.2.1. *Ad Valorem Tax claims*

Priority Tax Claims are Claims asserted by governmental units entitled to priority under Bankruptcy Code § 507(a)(8). The Bankruptcy Code does not require Priority Tax Claims to be classified under a plan, but requires that such claims receive the treatment described below unless the holder of such Claim consents to different treatment.

Any holder of an Allowed Priority Tax Claim shall receive at the Debtor's option (and with the consent of McElvenny) (i) the amount of the Allowed Priority Tax Claim in one cash payment on or immediately after the Effective Date or (ii) the amount of the Allowed Priority Tax Claim, with interest at 6% simple interest per annum or such other rate to be determined by the Court at the hearing on Confirmation of the Plan, in equal annual Cash Payments on each anniversary of the Effective Date, until the last anniversary of the Effective Date that precedes the sixth anniversary date of the date of assessment of the Allowed Priority Tax Claim.

A Priority Tax Claim that is a Contested Claim shall not receive any distribution on the Effective Date or thereafter unless and until such Claim becomes an Allowed Priority Tax Claim. Allowed Secured Claims for taxes will be satisfied first as non-classified Priority Tax Claims to the extent they qualify as Priority Tax Claims, but shall retain any collateral for such Claim until the Priority Tax Claim is paid in full. To the extent that some or all of an Allowed Secured Claim for taxes does not qualify as a Priority Tax Claim, but is a valid Allowed Secured Claim, it will be classified as a Secured Tax Claim.

### 10.3.2.2. *Ad Valorem Penalty Claims*

Ad Valorem Penalty Claims will not be paid as priority claims. They will be paid as Unsecured Claims, if at all.  The Debtor anticipates objecting to any penalty claim.

### 10.3.3. Claims of Secured Creditors (CLASS 2)

A separate category has been created in the Plan for treatment of each of those claimants that assert claims that are secured by property owned by GOCO and who are not treated elsewhere in the Plan. These are the claims of McElvenny and his Affiliated Entities, secured by virtually all assets of the estate[5] and the claim asserted by the State of New Mexico in the amount of $225,575.  These creditors will be paid their claims in the manner provided in Paragraph 10.3.3.1, below.  All documentation, including loan agreements, security agreements, financing statements, and other lien rights that existed prior to the filing shall remain in full force and effect and be reaffirmed by virtue of confirmation of the Plan, except to the extent that the Plan provides otherwise.  The funds for such payment will come from the business operations of the Debtor, issue of new stock, and recovery of certain litigation claims.  Mr. McElvenny and his Affiliated Entities are subordinating their right to payment, they are not subordinating their liens. Accordingly, should the Reorganized Debtor default in its obligations to Mr. McElvenny (or other Class 2 creditors), those creditors may foreclose on their interests.  Such a foreclosure would preempt the rights of subordinate creditors, including those creditors who are being paid under the delayed payout described for creditors in Section 5 of the Plan.

### 10.3.3.1.  Claims of Affiliated Entities

the Affiliated Entities have asserted secured claims in the amount of $934,921.07  which they assert is secured by perfected prepetition liens and security interests in the Debtor's personal property, wherever located, including, without limitation, accounts, chattel paper, inventory, equipment,  general intangibles as well as the Debtor's Oil and Gas interests. The Affiliated Entities have agreed under the Plan for satisfaction of their claims in the following manner:

### 10.3.3.1.1. Subordination of Right to Payment from Estate Funds

Except to the extent permitted under 10.3.3.1.4, the Affiliated Entities subordinate their right to payment of these secured claims until the Holder of Allowed Class 3 Claims are paid;

### 10.3.3.1.2. No Suit from Estate

---

[5]  The secured character of some of such claims has been challenged by the Committee.  However, Mr. McElvenny and Affiliated Entities deny that they are not fully secured.

The Affiliated Entities will not be subject to suit and they will give and receive substantial valuable releases from and to the Debtor in the Plan.

### 10.3.3.1.3. Debt/Equity Swap

Mr. McElvenny and his related entities will trade 40% of their claims (up to a maximum of $400,000) for 100% of the newly issued stock in GOCO; and

### 10.3.3.1.4. Limitation on Recovery from Estate Assets

The balance of Claims by the Affiliated Entities will be paid from recovery of litigation that GOCO has commenced against Natural Gas Fuel Corp and any other pre-confirmation litigation by the Debtor. Additionally, the Affiliated Entities have agreed that if the Plan is approved, they will allow their otherwise administrative claims for Debtor-in-Possession financing to be added to their pre-petition claim and paid in the same manner. However, the Affiliated Entities retain their liens on the Debtor's assets, as provided in 10.3.3.1.1, to secure eventual payment.

### 10.3.3.2.  State of New Mexico Claim

The State of New Mexico has filed a claim in the amount of $225,575.30 which is statutorily deemed to be secured by liens in some of the Debtor's New Mexico assets.   The Debtor proposes to pay this creditor in the same manner of Ad Valorem tax claims in paragraph 10.3.2.  Any and all valid liens held by the State of New Mexico perfected before bankruptcy will remain in full force and effect with the same priority as existed on the Filing Date until its secured obligation has been paid in accordance with the Plan.  The funds for such payment will come from the business operations of the Debtor.  A claim objection will be filed, if needed, to disallow this claim.

### 10.3.3.3.   Protective Claims

The Debtor objects to the protective claims filed by the New Mexico Oil Conservation Division (Claim #65, 66), and the Bureau of Indian Affairs ("BIA").  These claims are for estimated future plugging costs that the Debtor has not yet incurred, or for retroactive "recalculation" of prepetition rents and royalties.  The Debtor is not seeking to discharge future plugging costs and will specifically except them from discharge if needed.  However, the costs are not amounts owed and are not debts, defined by the bankruptcy code as "liability on a claim". Accordingly, Claims #63, 65 and 66 are objectionable.  A claim objection will be filed to disallow these claims.  The Plan makes disallowance of these claims a condition of confirmation, unless waived by the Debtor.

### 10.3.3.4. MMS Claims

The Mineral Management Service ("MMS") (Claim #22,63) filed a proof of claim seeking retroactive recalculation of rents and royalties, not based on what the Debtor actually paid, but based upon the amount that the MMS estimates the Debtor could have sold the gas for.  The Claim is at best an estimation and at worst barred by limitations and applicable case law.  The Debtor proposes no treatment or disputed claims reserve for this claim.  A claim objection will be filed to disallow this claim.  The Plan is conditioned upon disallowance of the MMS claim and/or allowance in an amount that is feasible to be satisfied.

### 10.3.4. Unsecured Claims (CLASS 3).

#### 10.3.4.1.*Universal Treatment - Payment over Time and Interest.*

Holders of Allowed Class 3 Unsecured Claims shall be paid in full over 6 years, with simple interest at 6% per annum.   These payments shall be made quarterly, in 24 equal installments of 4.166% of the Allowed Claim. These cash payments begin on the calendar quarter thirty (30) days after the Effective Date.   Payments will be made by the Reorganized Debtor to the Disbursing Agent, who will make payments from the Disbursement Account.  Claims allowed after the Effective Date will be paid as if the date the claim was allowed was the Effective Date, such that the interest will accumulate from the Effective Date.    All Class 3 claims are impaired and entitled to vote.

#### 10.3.4.2.*Class 3a Claims – ("Other")*

Holders of Class 3a "Other" Claims shall be paid in accordance with the above paragraph unless another agreement is reached with the respective Holder of a Claim.  Class 3a also includes the claims of Limited Partnerships of which the Debtor is General Partner.

#### 10.3.4.3.*Class 3b Claim Election (Working Interest)*

The Holders of Class 3b Claims (Working Interest Owners and Joint Venture Owners) may elect to be paid in cash, on the Effective Date, 40% of their Allowed Claim.  This election must be made before the Voting Deadline for Plan Confirmation.  The Election may be included in the Plan Ballot, or by other notice filed with the court and sent to the Debtor and Mr. McElvenny.

#### 10.3.4.4.*Class 3c Claim Election (Royalty Interest)*

The members of Class 3c "Royalty Interests" may elect to be paid in cash, on the effective date, 50% of their Allowed Claim (up to the aggregate total of $150,000), with any unpaid remainder of the reduced amount paid in accordance with the provisions of 10.3.4.1.   This election must be made before the Voting Deadline for Plan Confirmation.  The Election may be included in the Plan Ballot, or by other notice filed with the Court and sent to the Debtor and Mr. McElvenny.   Under the settlement agreement with MLG, MLG accepts primary liability for payment of prepetition royalties owed on the 71 and 363 leases, and the Class 3c interest should first look to payment there.

#### 10.3.4.5.*Class 3d Claims (Trade Claims)*

Each Holder of an Allowed Class 3d "Trade Claim" shall receive on the later of the Effective Date or approval by the Court of such Claim, 75% of the principal amount of such Claim, unless the Holder agreed to a different treatment of such claim.  Class 3d is impaired and entitled to vote.

### 10.3.5. The Stockholders of GOCO (CLASS 4)

GOCO is owned by approximately two-thousand individual stockholders, with Mr. McElvenny owning approximately forty-nine (49%) of the stock.  The Plan provides for the cancellation of all stock in GOCO that existed on May 12, 2003.  The stockholders will receive nothing under the Plan and therefore it will be presumed that they reject the proposed Plan.

### 10.3.6. The MLG Claims, (CLASS 5)

MLG shall receive the benefit of the Settlement Agreement, the respective interests in the 71 and 363 leases described therein, and the liabilities associated therewith. However, MLG members shall not receive distributions under any other class. The Debtor believes that this settlement is equal to or less than the amount they would receive as Class 3 creditors. The settlement with MLG was the result of an arms-length transaction between parties who negotiated in good faith.

### 10.3.7. Intercompany Claims Between GOCO and GOHC

All Claims and potential Claims between GOCO and GOHC will be waived and/or released. All non-intercompany assets and liabilities of GOCO and GOHC shall be merged into the Reorganized Debtor.

### 10.3.8. Contested or Disputed Claims

The Debtor may object to any Claims, and intends to object to claims that do not conform to the accounting of receivables and payables set forth in Exhibit 3.4.3.5 or 9.1.

As to any disputed Claim, upon  request for an estimate under Bankruptcy Code §502(c), the Bankruptcy Court shall estimate the disputed Claim for the purpose of allowing the Reorganized Debtor to fix the maximum distribution to which such disputed Claim will ever be entitled.   Within 90 days after the Effective Date, the Reorganized Debtor shall object pursuant to §502(a) of the Bankruptcy Code, or otherwise seek to fix the amount of any unliquidated Claim.

No distribution shall be made with respect to any Contested Claim or Interest, even if a portion of the Claim or Interest is not disputed, until the entire Claim or Interest within the applicable Plan Class is resolved by a Final Order, unless a creditor obtains an order of the Court to the contrary. For Claims allowed under the Plan, the Confirmation Order shall be deemed to be the order resolving such Claim. The Debtor believes this is legally permitted and will lead to more efficient distributions and claims processing.

Payment to each holder of a disputed Claim, to the extent it ultimately becomes an Allowed Claim, shall be made in accordance with the provision of the Plan governing the Class of Claims to which the disputed Claim belongs.  On the next quarter after the date of the order or judgment of the Bankruptcy Court allowing such Claim becomes a Final Order and is not subject to appeal, the Disbursing Agent will commence distributions to the holder of an Allowed Claim. The money shall be distributed on a going-forward basis, together with all interest or other earnings actually earned thereon to the date such distributions are made, except that interest shall accumulate as of the Effective Date.

### 10.4.   BIA and MMS Claims

No disputed claims reserve will be set aside for the claims filed by the Bureau of Indian Affairs or the Minerals Management Service or the State of New Mexico for estimated future well plugging costs or retroactive assessment of rents and royalties.

### 10.5.   MLG Settlement

The Debtor will seek, by approval of the Plan, approval of a compromise and Settlement with MLG.  The Settlement should have no effect on other unsecured creditors.

### 10.5.1.        Basis for Compromise.

MLG has been suing the Debtors and Mr. McElvenny for decades, and vice-versa.  MLG has not paid for expenses on the wells operated by Golden, and sued GOCO in New Mexico State Court.  As a result of its equipment issues, GOCO had not been able to properly account for well operations.  GOCO had accused MLG (or its predecessors) of improper well operations and other self-dealing in these suits.  Both parties have determined, for the benefit of the estate and themselves, on a trade of working interests to "divorce" their interrelated assets and grant mutual releases.

### 10.5.2.        Compromise and Settlement Terms.

The Debtor's compromise with MLG is approved upon entry of the final order confirming this Plan.  The compromise with MLG is complex; however its general terms are that the Debtor will convey both the assets and the limited liabilities (set forth below) relating to working interests in all wells on the 71 and 363 Leases (except for five wells on the 71 Lease being worked-over, which will be transferred after recouping allowable charges for the workover), in exchange for a transfer to GOCO of MLG's working interest in all other wells, and mutual release of any other liabilities.  In regards to the Section 71 Lease, MLG shall obtain all rights, title, interest and ownership in all wells or partnerships owned by partnerships, including all GOCO's Lease and working and operating interests. MLG shall obtain the Section 71 Lease subject only to prepetition royalty payments of $95,958, prepetition state taxes of $27,815, and plug and abandonment liabilities.  In regards to the Section 363 Lease, MLG shall obtain all rights, title, interest and ownership in all wells or partnerships owned by partnerships, including all GOCO's Lease and working and operating interests. MLG shall obtain the Section 363 Lease subject only to prepetition royalty payments of $-0-, prepetition state taxes of $-0-, and plug and abandonment liabilities. Any and all payments due as a result of the limited liabilities assumed by MLG set forth above, shall be paid in full over six (6) years, with simple interest at six percent (6%) per annum.  A Creditor may obtain a copy of the Settlement Agreement from counsel for the Plan Proponents.  The Settlement Agreement also expresses the position of MLG (Committee Chair) and the Debtor regarding the Allowed Claim of Committee Counsel and seeks to limit and allocate those fees and expenses, when and if Allowed.  Under the allocation, MLG would pay up to $25,000 of the Allowed Claim, and the Debtor would pay up to $75,000.

Energen and the Bureau of Indian Affairs has claimed that the transfers contemplated in the Plan, including transfers of interest required by the settlement, require the approval of the BIA and Jicarilla Apache Nation.  However, the Plan Proponents disagree, and would state that such approval is either a ministerial act, or a de facto anti-assignment clause prohibited under 11 U.S.C. §365(f) or a forfeiture prohibited under 11 U.S.C. §363(l).  Accordingly, the Debtor does not believe that such a requirement affects the ability to transfer the interests.

### 10.5.3.        Authority to Sign Title Transfer Documents on Behalf of Chace.

The Debtor or Reorganized Debtor may sign the documents necessary to effectuate the transfer of assets under the 1991 asset purchase agreement between Chace and the Debtor, specifically including forms required by the Jicarilla Apache Nation, even though Chace Oil Company may no longer exist.  This was a contentious issue that had been the subject of significant litigation.  The Debtor and Reorganized Debtor shall incur no liability for signing these required forms, or actions taken in reliance thereof.  The forms are required by the Jicarilla

Apache Nation, and the Bureau of Indian Affairs, and have little or no effect, other than to change the official status of the lessee on leases formerly operated by Chace.  The United States of America, Department of the Interior, Bureau of Indian Affairs has objected to this procedure because they believe that the Jicarilla Apache Nation may require a specific individual to make representations notwithstanding the decree of a Federal Court.   The Jicarilla Apache Nation has not specifically appeared in this case.  The Debtor's position is that the lease transfer document is a mere formality and does not create substantive rights not otherwise existing under applicable law (including tribal law).

> 10.5.4.      **Additional Releases**.

On the Effective Date, MLG shall be forever released and discharged from any and all claims, actions, suits, debts, accounts, Causes of Action, agreements, promises, damages, judgments, demands and liabilities which the Debtor or Creditors and Persons receiving or who are entitled to receive distributions under the Plan may have against them in any way related to the Debtor (including its predecessors or Affiliates) or this Case, except for obligations maintained between the Debtor and MLG by the Settlement (i.e. obligations relating to the 363 and 71 leases).

The Plan shall limit liability to MLG from GOCO or any third party to prepetition royalty payments and prepetition state taxes ase set forth above.  These claims shall be non-recourse to MLG except as against right, title and interest to post June 30, 2004 revenues associated with the operation of rights, title and interest in Section 71 and Section 363 Leases.

MLG shall release GOGO from any and all liabilities or claims, including those relating to wells located on the Section 71 Lease.  Upon execution and approval of the Settlement, MLG shall dismiss with prejudice the pending action in the First Judicial District Court in the State of New Mexico, including counter claims and third-party claims.

> 10.5.5.      **Relation to Other Creditors.**

Other creditors of the Estate should not be affected by the settlement with MLG, either positively or negatively.  While MLG will receive operations and the Debtor's interest in certain wells, MLG is also accepting the liabilities (including plugging and abandonment liabilities) associated with such wells.  In exchange, the Debtor also receives all of MLG's interest in wells on other leases (e.g. the 15, 47, 54, 70, and 361 Leases).  To the extent that there is any disparity of obligations, the disparity is likely offset by the savings of further years of litigation costs.

Notwithstanding the above, MLG and GOCO shall cooperate fully to obtain a lease and operation assignment from the Jicarilla's and to reduce any and all claims on behalf of MMS, Jicarilla and other governmental agencies against GOCO.  NO claims of MMS, Jicarilla or other governmental agencies shall survive against MLG or the MLG interests described in this Section 10.5 except as set forth herein.

**10.6.     Release and Discharge**

### 10.6.1. Discharge Generally

The Debtor believes that all liabilities have been accurately described, but seeks a general discharge to prevent unexpected interferences with the Debtor's assets from persons with notice of the bankruptcy. As is customary in Chapter 11 cases, the Debtor seeks to discharge liabilities not specifically listed or known. Moreover, upon confirmation the Debtor seeks an injunction under 11 U.S.C. §105 enjoining any person with notice of the bankruptcy from seeking to collect a pre-petition debt or violate the discharge.

Except as otherwise expressly provided in the Plan, Restated Articles of Incorporation, Restated By-Laws or Confirmation Order, confirmation of the Plan shall operate pursuant to Section 1141(d)(1) of the Code as a discharge, as of the Effective Date, of any and all debts and liabilities of, and any Claims or Liens against and Interests in, the Debtor or any of its assets that existed or arose at any time before Confirmation. On and after the Effective Date, as to every discharged debt, liability, Claim, Interest or Lien, the Creditor or other holder that held such debt, liability, Claim, Interest or Lien shall be precluded and enjoined from asserting or pursuing against (i) the Debtor or subsidiary formerly obligated on such debt or liability, or with respect to such Lien, Claim or Interest, (ii) the Affiliated Entities or the Debtor or subsidiaries' assets or properties, (iii) Reorganized Debtor or (iv) Reorganized Debtor's assets or properties, the Claim, Lien or Interest, or any other or further Claim based on any document, instrument, act or omission, transaction or other activity of any kind or nature that occurred before the Confirmation Date. There is no discharge of obligations which are expressly assumed in connection with the Plan, the Restated Articles of Incorporation, Restated By-Laws or Confirmation Order. This discharge is without prejudice to the Debtor's offset rights to the extent enforceable under applicable bankruptcy and non-bankruptcy law.

This release specifically does not limit any person's liability for plugging and abandonment costs related to wells that produce hydrocarbons, in which they hold (or have held) any ownership interest. This release likewise does not limit any person's liability as a Potentially Responsible Party ("PRP") under applicable environmental cleanup laws.

### 10.6.2. Release Generally

On the Effective Date, the following individuals and entities shall be forever released and discharged from any and all claims, actions, suits, debts, accounts, causes of action, agreements, promises, damages, judgments, demands and liabilities which the Debtor or Creditors and Persons receiving or who are entitled to receive distributions under the Plan may have against them in any way related to the Debtor (including its predecessors or Affiliates) or this Case: (i) the Debtor, and (ii) all directors, officers, affiliates, employees, members, partners, professionals or agents of the Debtor who served the Debtor on or after the Petition Date, and (iii) McElvenny and any of his affiliates or associates and all directors, officers, managers, partners, employees, Professionals or agents of the Plan Proponents or such affiliates or associates, both of the foregoing (in clauses (i) and/or (ii)) in any capacity whatsoever.

Intercompany rights and obligations may, at the election of Mr. McElvenny, be discharged and released. The Debtor and Mr. McElvenny believe the releases are appropriate and reserve all of their rights, arguments and defenses to be presented at the Confirmation Hearing with respect to the same. The releases in favor of the Debtor-related parties will resolve their indemnification claims and also will permit them to serve through confirmation and, in many instances, post-

confirmation without being distracted by suits and threatened claims, which is a benefit to the Reorganized Debtor.

### 10.6.3. Specific Release of claims by Jicarilla Tribe

Chace Oil Company, Inc., the entity that originally developed the wells, apparently disposed of trash and other waste at the site. The Jicarilla tribe required cleanup by the Debtor at a total cost to the Debtor in excess of $90,000. The Debtor, as operator and not owner or driller, is not solely liable for environmental trespass to Indian lands, or other cleanup claims. Chace Oil Company, the drilling company, and the control persons of Chace may be liable for this dumping, and for other, as-yet-undiscovered dumping at other well sites. Since there is a possibility of future attempts to collect cleanup costs from the Debtor or the estate, and since the Debtor specifically excluded environmental liability from its asset purchase agreement with Chace, the Debtor seeks a permanent injunction prohibiting the Jicarilla tribe from assessing further cleanup charges relating to these wells. However, this will not limit any person's liability to plug wells prior to abandonment, in accordance with state, federal or tribal laws requiring plugging and abandonment.

### 10.6.4. Specific Release of Claims against McElvenny

Even though Mr. McElvenny has been the subject of pre-bankruptcy litigation, he (and his Affiliated Entities) loaned over $900,000 to the Debtor pre-bankruptcy and up to $318,800 post-bankruptcy. In the Plan, Mr. McElvenny has agreed to subordinate his right to payment, convert up to $400,000 of the prepetition loans into equity, and agreed to look to limited estate resources for payment of the remainder (until unsecured creditors are satisfied under the Plan). Accordingly, Mr. McElvenny seeks a release of all claims against the Affiliated Entities, including those that could be asserted by or through the estate against him, to the maximum extent allowed by law.

### 10.7.   Modification or Revocation of the Plan

The Debtor may, with the consent of the Court and in accordance with the Bankruptcy Code, amend or modify the Plan prior to the date on which the Bankruptcy Court enters the order confirming the Plan (the "Confirmation Date"). The Debtor may seek to amend or modify the Plan as a result of substantive or technical objections to the Plan filed by holders of claims, as a result of any other matter that may affect the Debtor's ability to obtain confirmation of the Plan, or if for any other reason, such amendment or modification is determined by the Debtor to be in its best interest.

The potential impact of any such amendment or modification on the holders of claims cannot now be foreseen, but may include a change in the economic impact of the Plan on some or all of the Classes or a change in the relative rights of such Classes.

If such amendments or modifications are adverse, the Plan, as amended, may be resubmitted and any Class of claims that is adversely affected thereby may be given the opportunity to withdraw any votes for the Plan prior to such modification or amendment. After the Confirmation Date, inconsistencies in the Plan or in the order of the bankruptcy Court may be necessary to carry out the purposes and intent of the Plan, so long as the holders of claims are not adversely affected and the Bankruptcy Court approves such correction or reconciliation.

### 10.8.    Effective Date

The Effective Date shall be the eleventh day after the Confirmation Date, calculated in accordance with Bankruptcy Rule 9006, unless the Confirmation has been stayed or any of the conditions set forth in paragraph 10.4 of the Plan have not been met, in which event it is the first day after such stay is no longer in effect and conditions have been met (that is also eleven days after the Confirmation Date) calculated in accordance with Bankruptcy Rule 9006, or such later date as the Debtor and the Affiliated Entities shall unanimously agree to in writing, provided that all conditions to the effectiveness of the Plan have been satisfied on or before such date

### 10.9.    Disbursing Agent

#### 10.9.1. Formation

The Debtor proposes to employ a disbursing agent.  The disbursing agent would have certain rights and responsibilities, both to the Debtor and the Creditors.  The Disbursing Agent would act to pay Allowed Claims are paid in accordance with the Plan.  It may be an employee or designate of the Reorganized Debtor.

##### 10.9.1.1. Designated by Debtor

The Debtor shall designate an individual to be the Debtor's Disbursing Agent.  This may be an employee of the Debtor.  It may even be Mr. McElvenny.  However, the existence of a disbursing agent shall not prevent creditors receiving distributions under the plan from suing to enforce their rights upon plan default.

##### 10.9.1.2. Authority to Operate Disbursement Account

The Disbursing Agent has authority to open and operate the Disbursement Account and pay Allowed Claims from the account.

##### 10.9.1.3. Additional Scope

Terms and Scope of the Disbursing Agent's authority not inconsistent with this Plan may be agreed to by the Plan Proponents and submitted by the Effective Date or, with the consent of the Committee, after the Effective Date.

#### 10.9.2. Distribution

As soon as feasible after the Effective Date, the provisions of the Plan providing for distribution shall become the responsibility of the Disbursing Agent, who shall make such disbursements as required by the Plan.  The Disbursing Agent shall keep such records of such disbursements as required under generally accepted accounting procedures and make such records available to claimants from time to time upon reasonable notice until all Allowed Claims are paid in accordance herewith.  The Disbursing Agent may suspend distribution to any Creditor that has not provided it and the Debtor with written confirmation of a current mailing address and  Federal Tax Identification Number or social security number, as the case may be. Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within six months after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or

before the first anniversary of the Effective Date. After such date, all Claims in respect of void checks shall be discharged and forever barred

### 10.9.3. Payments to and From the Disbursing Agent

The Disbursing Agent and the Debtor shall agree on the amount of Allowed Claims being paid at each regularly quarterly payment at least 15 days before the end of the quarter. In the event they do not agree, the Debtor may apply to the Court for an adjudication of the amount owed and pay only the amount required by the Court to the Disbursing Agent. The Debtor shall pay the Disbursing Agent an amount equal to the percentage of the Allowed Claims being paid by that Agent in the regularly quarterly payment, at least 3 days before the end of the quarter. The Disbursing Agent shall maintain the Disbursement Account. Only the Disbursing Agent will have signatory authority over the Account. All monies remaining in the fund, if any, after Class 3 Allowed Claims are satisfied shall be returned to the Reorganized Debtor. Upon payment of all Allowed Claims, the Disbursing Agent's duties shall be discharged and the Disbursing Agent shall cease to act for the estate or its creditors.

## 11.    ACCEPTANCE AND CONFIRMATION OF THE PLAN

### 11.1.   Acceptance of the Plan

Confirmation of a Plan under Chapter 11 requires, among other things, that at least one class of creditors or claimants, such as the secured or unsecured creditors in this case, vote in favor of the Plan. This vote is calculated by only counting those creditors who actually send in a ballot on time. If two thirds in total dollar amount and a majority in number of claims actually voting in a class approve the Plan, that class of creditors is considered an accepting class. If the vote is insufficient, the Court can still confirm the Plan, but only upon being provided additional proof regarding the ultimate fairness of the Plan to the creditors. The Debtor believes that the unsecured creditors will support the Plan when they consider the fact that the secured and priority creditors will receive the majority of all of the assets of the Debtor in the event the reorganization is unsuccessful.

The proponent of a Plan also must meet all other applicable requirements of Section 1129(a) of the Bankruptcy code (except Section 1129(a)(8), if the proponent proposes to seek confirmation of a Plan under Section 1129(b) of the Bankruptcy Code). These other requirements include, among other things, that the Plan comply with the applicable provisions of Title 11 and other applicable law, that the Plan be proposed in good faith, and that at least one impaired class of creditors vote to accept the Plan. GOCO believes that the Plan satisfies all other applicable requirements of Section 1129(a) of the Bankruptcy Code.

### 11.2.   Confirmation without Acceptance of All Impaired Classes

The Bankruptcy Court may confirm a plan even if not all impaired classes accept the Plan. For the Plan to be confirmed over the rejection of an impaired class, the proponent must show, among other things, that the plan does not discriminate unfairly and that the plan is fair and equitable with respect to each impaired class that has not accepted the plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class if, among other things, the plan provides:  (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain, on account of its claim, property that has a value as of the Effective Date of the plan, equal to the allowed amount of such claim; and

(b) with respect to unsecured claims and interests, that the holder of any claim or interest that is junior to the claims or interest of such class will not receive or retain, on account of such junior claim or interest, any property unless the senior class is paid in full. The Bankruptcy Court must further find that the economic terms of a plan do not unfairly discriminate as provided in Section 1129(b) of the Bankruptcy Code with respect to the particular objecting class.

**THE DEBTOR BELIEVES THAT THE PLAN HAS BEEN STRUCTURED SO THAT IT WILL SATISFY THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AND CAN BE CONFIRMED OVER THE REJECTION OF THE PLAN BY SECURED CREDITORS, IF A CRAMDOWN IS REQUESTED. HOWEVER, THE AFFIRMATIVE VOTE OF THE UNSECURED CREDITORS IS NEEDED TO ALLOW FOR PLAN APPROVAL. THE DEBTOR BELIEVES THAT THE UNSECURED CREDITORS WILL SUPPORT THE PLAN SINCE THE ALTERNATIVE, LIQUIDATION, WILL LIKELY PAY SECURED AND PRIORITY CREDITORS THE MAJORITY OF THE ESTATE'S ASSETS, LEAVING LITTLE OR NO RETURN TO UNSECURED CREDITORS.**

### 11.3. Impairment of Claims

A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interest of that class are modified under a plan. Modification for purposes of determining impairment however, does not include curing defaults and reinstating maturity or cash payment in full. Classes of claims or interests that are not "impaired" under a plan are conclusively presumed to have accepted the plan and are thus not entitled to vote. Classes of claims or interests receiving no distribution under a plan are conclusively presumed to have rejected the plan and thus are not entitled to vote. Acceptances of the Plan are being solicited only from those persons who hold claims in an impaired class entitled to receive a distribution under the Plan.

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a plan, **unless**, with respect to each claim or interest of such class, the plan:

1.  Leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

2.  Notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of its claim or interest after the occurrence of a default:

    (a)  Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankrupt Code;

    (b)  Reinstates the maturity of such claim or interest as it existed before the default;

    (c)  Compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

    (d)  Does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or interest; or

3. Provides that, on the Effective Date the holder of such claim or interest receives, on account of such claim or interest, cash, equal to:

 (a) With respect to a claim, the allowed amount of such claim; or

 (b) With respect to an interest, if applicable, the greater of:

  (1) Any applicable fixed liquidation preference; or

  (2) Any fixed preference at which the Debtor, under the terms of the security, may redeem the security.

In Section 5 of the Plan, the Debtor has identified the impaired classes of creditors under the Plan. In the event there are questions regarding whether a person is in an impaired class, the person should assume that his or her claim is impaired and vote. If the claim is determined to be impaired, the vote will be considered by the Bankruptcy Court. Classes 2 and 3 are impaired under the Plan.

**IMPAIRED CREDITORS ANTICIPATED TO RECEIVE A DISTRIBUTION UNDER THE PLAN ARE BEING SOLICITED TO VOTE. IF YOU HOLD AN ADMINISTRATIVE CLAIM OR UNIMPAIRED CLAIM, THE DEBTOR IS NOT SEEKING YOUR VOTE. ADDITIONALLY, THE VOTE OF EQUITY HOLDERS IS NOT SOLICITED AND IS DEEMED A REJECTION VOTE SINCE THEY RECEIVE NO DIVIDEND UNDER THE PROPOSED PLAN.**

### 11.4. Best Interest of Creditors

Even if all classes of claims accept the Plan, the Bankruptcy Court may, nonetheless, still find the Plan unconfirmable. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests" test and be feasible. The "best interests" test generally requires the value of the consideration to be distributed to the holders of claims or interests under the Plan to not be less than those parties would receive if the Debtor were liquidated in a hypothetical liquidation under Chapter 7 of the Bankruptcy Code. See for example, Exhibit "12.5" attached to this Disclosure Statement for a detail estimation of liquidation results. This revised Exhibit 12.5 accounts for changes to the Debtor's assets and liabilities resulting from the MLG Settlement. Under the "feasibility" requirement, the Bankruptcy Court must find there is a reasonable probability that the Debtor will be able to meet the obligations created under the Plan, without the need for further financial reorganization.

**THE DEBTOR BELIEVES THAT THE "BEST INTERESTS" TEST AND THE FEASIBILITY REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE CAN BE SATISFIED AT THE CONFIRMATION HEARING. SEE "SUMMARY OF THE PLAN."**

## 12. Voting Procedures

### 12.1. Who May Vote

Any creditor of the Debtor whose claim is **IMPAIRED** under the Plan is entitled to vote, if either (1) the claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent or unliquidated, or (2) the creditor has filed a proof of claim on or before the

last date set by the Bankruptcy Court for such filings; *provided, however* that any claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon motion by the creditor. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.  In addition, a creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 12.2.   Effect of failure to vote

Holders of impaired claims who are entitled to vote and fail to do so will not be counted as either accepting or rejecting the Plan.  Nevertheless, if the requisite vote is achieved for your class of impaired claims, you will be bound by the terms of the Plan.

### 12.3.   Ballot Form

A ballot to be used for voting to accept or reject the Plan will be enclosed with the Plan and mailed to creditors entitled to vote.  A creditor must (1) carefully review the ballot and the instructions thereon, (2) execute the ballot, and (3) return it to the address indicated thereon by the deadline to enable the ballot to be considered for voting proposes.

### 12.4.   Voting Procedures

THE DEADLINE FOR RETURNING YOUR BALLOT IS STATED
ON THE ENCLOSED BALLOT
(THE "VOTING DEADLINE").

After completion of the ballot, creditors should return the executed ballot in the self-addressed envelope to:

**GOCO PLAN
C/O PETER JOHNSON, ESQUIRE
P.O.  BOX 980877
HOUSTON, TX  77098-0877**

Alternatively, the ballot may be sent to Mr. Johnson via Fax to 713-552-1433, and actually received before 4:00 p.m. Houston time on the Voting Deadline.  Faxes must be legible and should be followed by an original via mail.  The Creditor should also confirm receipt of the fax via a separate confirmation.  In the event the fax number is busy or a fax error prevents receipt, the creditor may fax a ballot to Counsel for Mr. McElvenny at 713-961-5341, c/o Hugh M. Ray, III.

**VOTING INFORMATION AND INSTRUCTION FOR COMPLETING THE BALLOT:**

1.      **FOR YOUR VOTE TO BE COUNTED YOU MUST COMPLETE THE BALLOT, INDICATE ACCEPTANCE OR REJECTION OF THE PLAN IN THE BOXES INDICATED ON THE BALLOT AND SIGN AND RETURN THE BALLOT TO THE ADDRESS SET FORTH ON THE PRE-ADDRESSED ENVELOPE.  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.**

2.    If you hold claims in more than one class under the Plan, you may receive more than one ballot.  Each ballot you receive votes only your claims for that class.  Please complete and return each ballot you receive.  You must vote all of your claims within a singe class under the Plan to either accept or reject the Plan.  Accordingly, a ballot (or multiple ballots with respect to multiple claims within a single class) that partially rejects and partially accepts the Plan will not be counted.

3.    The ballot is for voting purposes only and does not constitute and shall not be deemed a proof of claim or interest or an assertion of a claim.

### 12.5.    Chapter 7 Liquidation Analysis

GOCO intends to use the Plan as vehicle to pay creditors a meaningful dividend and therefore prevent the race by individual creditors to dismantle the assets and provide an unfair advantage to some creditors. The property owned by GOCO may be sufficient to provide payment to the secured creditors, but liquidation would almost dictate that unsecured creditors would not be paid any meaningful amount and they are better served by the proposed plan.  As a result of the foregoing, if GOCO liquidated its assets in Chapter 7, it is unlikely that unsecured creditors would be paid in full.  GOCO believes the attached Exhibit "12.5" is an accurate overall estimation of liquidation value of the Debtor's assets estimated as set forth in the Exhibit.

### 12.6.    Feasibility of the Plan

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the bankruptcy court, the bankruptcy court must determine that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.  GOCO believes that it will be able to fulfill its obligations under the Plan.  Attached hereto as Exhibit 12.6 is the Debtor's projection demonstrating the feasibility of the Plan.  Exhibit 12.6  was prepared by GOCO management from historical data and a projection model that incorporates the transition of the Debtor from its prior operation to operations with completed workovers and full production.  The projections contained in Exhibit 12.6 assume that revenue will be produced as projected by use of the current facilities and equipment.  The Debtor believes that they are sufficient to support the additional business and GOCO believes its aggressive workover campaign of its properties will continue to increase its revenues.   To the extent revenue of the Debtor is insufficient to fund the payments, including the initial payment on the Effective Date, Mr. McElvenny has agreed to fund up to an additional $350,000 to fund the Plan, thorough a loan facility secured by all assets of the Debtor, that does not impair the Debtor's ability to pay allowed Class 3 claims.  The $350,000 should satisfy the immediate obligations of the Debtor, according to the Debtor's analysis of the amounts that will be owed.

### 12.7.    Alternatives to the Plan

If the Debtor's exclusive period to file a plan of reorganization and solicit acceptances of a plan of reorganization has expired pursuant to § 1121 of the Bankruptcy Code, other parties could propose their own plans of reorganization for the Debtor. The Debtor's current exclusive

right to file a plan of reorganization continues through March 22, 2004 and its current exclusive right to solicit Ballots continues through May 26, 2004, without prejudice to their right to seek a further extension of its rights to solicit acceptance of the Plan and without prejudice to any party's rights to seek to shorten the exclusivity periods. The Debtor has consented to McElvenny being a co-Plan Proponent due to McElvenny's leading role in post-confirmation management and its financial commitments to the reorganized Debtor set forth above.

Alternatives to confirmation of the Plan include the submission of an alternative plan of reorganization by any party in interest in the event that GOCO's exclusive right to file a plan of reorganization and solicit acceptances should expire. The liquidation of the Debtor under Chapter 7 of the Bankruptcy Code, as described above (See Chapter 7 Liquidation Analysis), would also be an alternative to the Plan.

### 12.8.    Risk to Creditors if Plan is Approved

It is probable that the unsecured creditors would not receive a significant dividend under Chapter 7. Even if this case were dismissed, unsecured creditors would be relegated to the random collection of assets on an *ad hoc* and liquidation value basis. However, under the Plan, the business operation developed by GOCO during its history will continue and GOCO believes that it will succeed in the implementation of its operational restructure that will provide payment of claims within the budget that will allow fair and equal treatment to all creditors. There is always the risk that GOCO might be unable to pay any dividend if the market for its oil and gas production changes or some other unknown contingency occurs that impairs the ability of GOCO to produce the revenues needed. However, the unsecured claims will have benefited from the subordination of the secured claim of McElvenny under the Plan and will be much better off than if the estate were liquidated. The Debtor believes that such a liquidation would forfeit the net operating losses and return less money to the unsecured creditors. The Debtor believes that the Plan is clearly in the best interests of creditors as it proposes to pay 100% of allowed unsecured claims.

### 12.9.    Benefits and Risks of Chapter 7

Chapter 7 has the benefit of simplicity, but the disadvantages are substantial. In Chapter 7 liquidation, the estate is sold as quickly as possible by a Chapter 7 Trustee. The Chapter 7 Trustee pays all secured and administrative claims, then all priority claims, then unsecured claims if any money is left. The Chapter 7 Trustee also pursues litigation for the benefit of the estate.

### 13.    LITIGATION

### 13.1.    Pending Litigation

There were lawsuits pending against GOCO prior to the filing of the case. This litigation was stayed by the bankruptcy filing and the claim of these creditors will be treated under Class 3 of the Plan and all such litigation terminated as a result of the confirmation of the Plan. However, to the extent that the Debtor seeks affirmative relief against adversaries in this litigation, such claims of GOCO will be preserved and will survive the confirmation of the Plan, unless settled before or on the Effective Date by separate motion, or as part of the Settlement with MLG.

- *Elliott S. Slusky and Harvey E. Slusky vs. Golden Oil Company Cause #: D-0117-CV-2000-00819 First judicial District Court, State of New Mexico, County of Rio Arriba.*

- *Matteucci, et al vs. Golden Oil Company,Cause #: D-0117-CV-2002-01924, First Judicial District Court, State of New Mexico,County of Rio Arriba. (compromised as part of the MLG Settlement)*

- *EOG Resources, Inc. vs. Golden Oil Company, Cause #: D-101-CV-2002-02733, First Judicial District Court, State of New Mexico,County of Rio Arriba.*

- *Golden Oil Company vs. Natural Gas Fuel Company, Cause #: 2002-30405, 11th Judicial District Court, State of Texas, County of Harris. (susequently removed to the Bankruptcy Court).*

- *Nortex Corporation vs. Golden Oil Company, Cause #: 2001-60688, 295th Judicial District Court, State of Texas, County of Harris.*

## 13.2.   Anticipated Litigation

### 13.2.1. Unresolved Claims Objections

The Debtor will object to certain claims at or before the confirmation date.  However, those objections may not be resolved by confirmation.  Thus, the Debtor may litigate the claim objections to determine the status of claims post-confirmation.

### 13.2.2. Litigation against Lotspeich and MLG

The Debtor has pursued litigation against Mr. Lotspeich, but now intends to compromise that litigation, and many related suits, by approval of the Settlement Agreement referenced in the Plan and herein.

### 13.2.3. Litigation to Avoid Preferences and Fraudulent Transfers

#### 13.2.3.1.*Investigation*

The Debtor is in the process of investigating various causes of action they may have under applicable state and federal law (including, without limitation, the Bankruptcy Code). The Debtor has investigated potential causes of action against the recipients of releases (including the Affiliated Entities) under the Plan and concluded that there are no viable causes of action against them that would result in a better recovery for the estate than this Plan. The Debtor does not believe there are other avoidance actions of any material value, but are still investigating the same as of the date hereof. All such remaining avoidance actions will be retained by the reorganized debtor, on the Effective Date.

The Committee has conducted an investigation of certain claims and causes of action and has advised the Debtor that the Committee believes certain actions exist. However, in light of the increased consideration being offered under the Plan, the Debtor believes that the release offered the Affiliated Entities is in the best interests of the Estate.

### 13.2.3.2. *No Anticipated Litigation against Mr. McElvenny*

Under the Bankruptcy Code, certain transfers (including perfection of liens) made before the bankruptcy filing may be recovered by the estate. The only anticipated avoidance litigation would be a preference claim against Mr. McElvenny, who in the Plan agrees to forego up to $400,000 of his claim and subordinate his right to payment (although not Affiliated Entities' right to enforce their security interests) for the remainder in exchange for (among other things) a release of such liability. Mr. McElvenny has also agreed to facilitate certain additional loans and may be required to fund the Plan on the Effective Date. Accordingly, the Debtor does not anticipate any litigation to avoid preferential or fraudulent transfers.

### 13.2.4. Litigation to Collect Amounts Receivable

### 13.2.4.1. *Nature of Suit*

The Debtor incurred certain expenses and will incur other expenses as the direct result of operation of the wells and of the plugging and abandonment of the wells. Accordingly, the Debtor has assessed working interest owners for these charges. The Debtor may sue to collect these charges. Alternatively, the Debtor may, at its option, accept the working interest in lieu of payment. This does not apply to working interests of MLG, which are deemed to be transferred on the Effective Date.

### 13.2.4.2. *Amount Sought*

Attached as Exhibit 3.5 is the list of parties who owe the Debtor and the amounts owed. Those amounts are also described in the Debtor's amended schedules (Exhibit 3.4.1.2). These amounts do not reflect reductions for the MLG Settlement.

### 13.2.5. Special Counsel and Special Oil & Gas & Environmental Counsel

The Debtor has proposed to retain Campbell, George & Strong, P.C. as special Oil & Gas and Environmental Counsel for the purposes of consulting with and/or performing those tasks required to represent the estate in the collection of receivables and any other litigation the Debtor deems prudent to investigate or pursue, in its exercise of sound business judgment.

## 14.    GOVERNMENTAL REGULATION

The Debtor's operations are subject to various comprehensive laws and regulations related to the protection of the environment. Among other things, such laws and regulations, (i) impose liability for remediation and clean-up of environmental contamination, both on-site and off-site, resulting from past and present operations at the Debtor's facilities; and (ii) may require financial assurance that funds will be available for the closure and post-closure care of sites of operations. These requirements may also be imposed as conditions of operating permits or licenses that are subject to renewal, modification or revocation. These laws and regulations have become and are likely to continue to become increasingly stringent. Existing laws and regulations, and new laws

and regulations, may require the Debtor to modify, supplement, replace or curtail its operating methods, facilities or equipment at costs which may be substantial without any corresponding increase in revenues.

Items that may be described as "hazardous" are present in some of the facilities used by the Debtor. Remediation may be required at these sites at substantial cost. Estimates of the Debtor's liability for remediation of a particular site and the method and ultimate cost of remediation require a number of assumptions and are inherently difficult. There can be no assurance that the ultimate cost and expense of corrective action will not substantially exceed have a material adverse impact on the Debtor's operations or financial condition.

In the normal course of its business, and as a result of the extensive governmental regulation of the oil production industry, the Debtor may become the subject of administrative and judicial proceedings by regulators and subject to requirements to remediate environmental contamination or to take corrective action.

There are additional government regulations that that apply to production of Oil and Gas on the Jicarilla lands. Notwithstanding the foregoing, GOCO maintains close supervision over its employees to assure compliance with both Federal and State laws.

## 15.    SELECTED FINANCIAL DATA

### 15.1.    Method of Accounting Used by Debtor

The Debtor has utilized the accrual method of accounting in the preparation of its financial reports and accounting since its inception.

### 15.2.    Financial Reports

The Debtor has attached hereto as Exhibit 3.5 is a copy of the most recent statement of operations, which is the most current monthly operating report produced and filed with the Court in this case, and has further disclosed details of its assets and liabilities throughout this Disclosure Statement.

## 16.    PREFERENCES AND RECOVERABLE TRANSFERS

The provisions of §§544, 545, 546, 547 & 548 of the bankruptcy code provide for the recovery of property that was transferred to both existing creditors and other parties during the time period prior to bankruptcy filing ("Transfers"). The purpose of these provisions is to assure each creditor that they will be treated fairly and equal to creditors that have similar claims. For example, it would be unfair to allow a creditor to be paid on an overdue debt just prior to filing of the case when other creditors do not get paid. The law presumes that a transfer is recoverable if it was made within 90 days prior to bankruptcy filing and the transfer was for the payment of an antecedent or stale debt. There exist several defenses to the recovery of such transfers, such as consumer debts paid in an amount less than $600,  which may in some cases defeat an action to recovery such transfers.

As mentioned in paragraph 13.2.3, after an examination of the records of the Debtor, it does not appear that any preferential or fraudulent transfers that can economically be recovered

exist.  Should such transfers be discovered, the Reorganized Debtor may pursue them to the extent not barred by the releases in this plan, and to the extent not waived by applicable law.

## 17.     AFFILIATES OF THE DEBTOR

The Debtor is the 100% stockholder and owner of two following entities:

**Golden Oil Holding Company** is a Delaware Corporation and was the operator of approximately 88 wells located on the Jicarilla Apache Indian Nation in the state of New Mexico, before transferring those operations to the Debtor.

**Golden Resources, Inc.** is a Delaware corporation and is both the owner and operator of approximately 40 oil and gas wells located in the State of Oklahoma.  GOCO holds ownership of and exercises the responsibilities of a major shareholder in reviewing and making proposals regarding GOCO operations.

## 18.     MANAGEMENT OF THE REORGANIZED DEBTOR

### 18.1.   Restated By-Laws and Articles of Incorporation

On or before the Effective Date, Reorganized Debtor's Articles of incorporation and by- laws may be amended and restated to prohibit the issuance of non-voting equity security to the extent required by Code § 1123(a)(6) and such other modifications as may be approved in the Confirmation Order ("Restated Articles of Incorporation" and "Restated By-Laws").  Such documents will provide for a ratification and confirmation of Agreements of post-petition directors and officers of the Debtor for reasonable director and officer insurance.

### 18.2.   Members of the Board

The Plan provides for the current members of the Management to continue to serve.  Set forth below is a description of the background of each of the members of the Board of Directors. Ralph T. McElvenny, Jr. and John T. Miller are the members of the Board of Directors of the Debtor Corporation and Mr. McElvenny now serves as Chairman. Mr. McElvenny's Qualifications are attached as Exhibit 3.3.1.

### 18.2.1. Initial Salary of Officers and Directors

| FUTURE DIRECTORS OF THE REORGANIZED DEBTOR | MONTHLY COMPENSATION |
|---|---|
| Ralph T. McElvenny, Jr. | None |
| John T. Miller | *$800* |
| **FUTURE OFFICERS OF THE REORGANIZED DEBTOR** | **MONTHLY COMPENSATION** |
| *Ralph T. McElvenny, Jr., President* | *$10,000* |
| *Theodore D. Oldham, Secretary & Director of Operations* | *$6,000* |
| Total Monthly Officer Compensation: | *$16,800* |

### 18.2.2. Future Determination of Compensation of Management

The Board of Directors will at least annually review the management performance and growth of the company.  They may not raise the salary of Mr. McElvenny above a Cost of Living Adjustment equal to the change in the Consumer Price Index until 80% of the Class 3 Allowed Claims are satisfied.

## 18.3.   Key Employees

The reorganized Debtor's successful transition through the restructuring process is dependent in part on its ability to retain and motivate its officers and key employees. The Debtor's current financial difficulties have had a detrimental effect on its ability to attract and retain key officers and employees. There can be no assurance that the Debtor will be able to retain or employ qualified management and technical personnel.   Accordingly, the Debtor may enter into employment agreements with certain members of its senior management (Other than Mr. McElvenny).  Should any of these persons be unable or unwilling to continue their employment with the reorganized Debtor, its business prospects could be materially and adversely affected

## 19.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

## 19.1.   Tax consequences to the Debtor

### 19.1.1. Net Operating Loss and Excess Interest Expense Carryforward of the Debtor

The Debtor and its affiliates have an approximate $8.5 million consolidated net operating loss ("NOL") carryover related solely to the operations of the Debtor and its subsidiaries and that is attributable to taxable years ending on or before December 31, 2002.

### 19.1.2. Realization of Cancellation of Indebtedness Income

Generally, a taxpayer recognizes cancellation of indebtedness ("COD") income upon satisfaction of its outstanding indebtedness for less than its adjusted issue price. The amount of COD income is, in general, the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the issue price of any new indebtedness issued by the taxpayer, the amount of cash and the fair market value of any other consideration (including stock of the taxpayer) given in exchange for the indebtedness satisfied.

However, COD income is not included in gross income to a debtor if the discharge occurs in a Title 11 case or the discharge occurs when the debtor is insolvent (except with respect to certain discharged intercompany debt which is treated as both income and an offsetting loss to the group). Rather the debtor generally must, after determining its tax for the taxable year of discharge, reduce its NOLs and any capital loss carryovers first and then, as of the first day of the next taxable year, reduce the tax basis of its assets by the amount of COD income excluded from gross income by this exception. Recently issued temporary Treasury Regulations provide that, to the extent that the excluded COD income of a debtor is applied to reduce the tax basis in the stock of a subsidiary member of the U.S. consolidated group, such excluded COD income is treated as recognized by the subsidiary. These regulations also provide that to the extent that the excluded COD income recognized by the debtor is not applied to reduce its tax attributes, such remaining excluded COD income is applied to reduce the tax attributes of the members of the debtor's U.S. consolidated group (other than the tax basis in their assets). As an exception to the

order of such reduction set forth in the Tax Code, a debtor may elect to reduce its tax basis in its depreciable assets first, then its NOLs. As a result of such an election, the debtor would reduce the tax basis in its directly held depreciable assets, and thereafter the tax basis in the depreciable assets held by the next lower-tier U.S. consolidated subsidiary to the extent that the subsidiary consents. A debtor can apply this rule successively down the chain of U.S. consolidated subsidiaries. To the extent that the tax basis in the depreciable assets held by a lower-tier subsidiary is reduced, the tax basis in its stock held by a group member will also be reduced. After the reduction in tax basis in depreciable assets held by a debtor and all consenting U.S. consolidated subsidiaries, the tax attributes of the debtor and the members of its U.S. consolidated group would be reduced as set forth above to the extent of any remaining excluded COD income.

The COD income recognized by a Debtor as a result of consummation of the Plan will not be includable in the income to the Debtor realizing such income but will generally first reduce the NOL carryover of the Debtor after the calculation of tax for the taxable year of discharge, then would reduce the tax basis of the assets held by the Debtor on the first day of the taxable year after discharge. To the extent that the tax basis in the stock of a subsidiary member of the U.S. consolidated group of the Debtor is reduced, such excluded COD income is to be treated as recognized by the subsidiary resulting in a corresponding reduction in the tax attributes of the subsidiary. Thereafter, any remaining excluded COD income of the Debtor would be applied to reduce the tax attributes of members of the U.S. consolidated group (other than tax basis). Notwithstanding the foregoing, an election may be made to first reduce the tax basis of the depreciable assets held by the Debtor and held by its consenting subsidiaries prior to the reduction of the tax attributes of the Debtor and its U.S. consolidated group as discussed above.

### 19.1.3. Limitation to Utilization of NOLs -- Section 382 of the Tax Code

#### 19.1.3.1. *General Rules.*

In general, Section 382 of the Tax Code limits the amount of pre-change losses (i.e., NOLs, losses incurred in the current year prior to the "ownership change" and losses and deductions recognized in a period after an "ownership change" that are attributable to a "built- in-loss" existing on the date of the "ownership change") that a loss corporation may use to offset its income in any year (or portion thereof) following an "ownership change" (as described below) (hereinafter, the limitation under Section 382 of the Tax Code is referred to as the "Section 382 Limitation"). The Section 382 Limitation on the use of prechange losses in any post-change year is equal to the product of the fair market value of the corporation's outstanding stock immediately before the ownership change and the long-term tax exempt rate (which is published monthly by the Treasury Department and is intended to represent current interest rates on long-term tax-exempt debt obligations) in effect for the month in which the ownership change occurs. For the year in which an "ownership change" occurs, the Section 382 Limitation is pro rated for the portion of the year that follows the "ownership change."

An "ownership change" occurs under Section 382 of the Tax Code if the percentage of stock of the corporation owned actually or constructively by one or more "5-percent shareholders" increases by more than 50 percentage points by value on any "testing date" (taking into account all relevant adjustments as of the end of a "testing date") as compared to the lowest percentage of stock of the corporation owned by those 5-percent shareholders at any time during the statutory "testing period" (generally, the past three years or, if shorter, since the last ownership change). Generally, a "testing date" is any date there is any change in the stock

ownership that affects the percentage stock ownership of a 5-percent shareholders. A "5-percent shareholder" is one who owns, directly or indirectly, at least five percent of the stock of the corporation (not including certain nonvoting nonparticipating preferred stock), and stock owned by shareholders, who are not 5-percent shareholders (hereinafter referred to as a "public group"), is treated as being owned by one or more separate 5-percent shareholder. That is, a public group is generally created as a result of an issuance of stock and, absent an exception, is treated as a separate public group from any other public group existing prior to the stock issuance. For purposes of determining whether an "ownership change" has occurred, interests other than stock are treated as stock if (i) as of the time of issuance to a 5-percent shareholder (or a person who would be a 5-percent shareholder if the interest not constituting stock were treated as stock), such interest offers a potential significant participation in the growth of the corporation; (ii) treating the interest as constituting stock would result in an ownership change and (iii) the amount of the pre-change losses is more than twice the amount determined by multiplying (a) the value of the loss corporation by (b) the federal long-term tax exempt rate.

### 19.1.3.2. *Section 382(l)(5) of the Tax Code.*

Section 382(l)(5) of the Tax Code provides that the general Section 382 Limitation does not apply to an "ownership change" resulting from transactions that are pursuant to a Title 11 case if shareholders and "qualified creditors" of the debtor receive (as a result of being shareholders or "qualified creditors" immediately before such change) at least 50 percent of the stock of the debtor by vote and value after the ownership change. "Qualified creditors" of a debtor include (i) creditors that either (a) have held their indebtedness for at least 18 months prior to the bankruptcy filing or (b) creditors whose indebtedness arose in the ordinary course of the debtor's trade or business. However, where there is an "ownership change" under Section 382 of the Tax Code and Section 382(l)(5) of the Tax Code applies, the NOLs that may be carried forward subsequent to the "ownership change" are computed as if no deduction were allowable for interest paid or accrued for the current year and the three prior years with respect to debt that is converted to stock. Further, if Section 382(l)(5) of the Tax Code applies with respect to an ownership change, if there is an ownership change within two years of the Effective Date, the Section 382 Limitation with respect to that ownership change will be zero.

The Debtor believes that the percentage of stock of Debtor owned actually or constructively by one or more 5-percent shareholders will likely increase as a result of the consummation of the Plan by more than 50 percentage points by value as compared to the lowest percentage of stock owned by each such 5-percent shareholders during the three- year period ending on the Effective Date. As a result, absent the applicability of Section 382(l)(5) of the Tax Code, the ability of each Debtor to utilize any NOLs and other pre-change losses (including depreciation to the extent attributable to any built- in- losses existing on the change date) remaining after reduction by excluded COD income would be subject to the Section 382 Limitation. However, Section 382(l)(5) of the Tax Code may apply to prevent the application of the Section 382 Limitation to the extent that more than 50 percent of the Interests of the Debtor will be received in exchange for the Indebtedness to Mr. McElvenny  and Affiliated Entities that constitutes "qualified indebtedness" for purposes of Section 382(l)(5) of the Tax Code. The Debtor and McElvenny intend that Section 382(l)(5) of the Tax Code will apply with respect to the Plan to prevent the application of the Section 382 Limitation although there can be no assurance that the Plan will so qualify.

### 19.1.3.3. Section 382(l)(6) of the Tax Code.

If the requirements of Section 382(l)(5) of the Tax Code are not satisfied, Section 382(l)(6) of the Tax Code would provide that the Section 382 Limitation would be determined by using the value of the stock of the Debtor as reflected by any increase in value resulting from the surrender or cancellation of Claims pursuant to the Plan (and litigation planned thereunder).

However, under the plan the Debtor will restrict the transfer of stock received by a creditor for two (2) years.  Accordingly, Section 382(l)(6) does not apply.

### 19.1.3.4. Section 368(a)(1)(g)

Under Section 368(a)(1)(g), the Debtor loses its NOL carryforward if the Debtor's assets are transferred to a new corporation and the stock in the new corporation is transferred to the bankruptcy claimants in a tax free transfer under Sections 354, 355 or 356.

### 19.1.3.5. Other NOL restrictions

The reorganized debtor must continue the substantial pre-bankruptcy line of business. Treas. Reg. § 1.269-3(d)(1).

### 19.1.4.  Dissolution of the Partnerships

The Dissolution of the Partnerships should be tax neutral to the Debtor as a result of the pass-through tax treatment and the fact t he Debtor was the General Partner.  However, if there were tax consequences, they would likely be minor and offset by the NOL carryover.  This statement has not been evaluated by a tax professional.

### 19.1.5.  Alternative Minimum Tax

A corporation generally must pay an alternative minimum tax ("AMT") equal to 20 percent of its alternative minimum taxable income ("AMTI") reduced by certain credits allowable for AMT purposes to the extent that the AMT exceeds the tax of the  corporation calculated at the normal progressive income tax rates. In calculating the AMTI, a corporation's income and losses are subject to various adjustments. For example, in computing AMTI, a corporation's NOLs are adjusted for the adjustments and preferences under the AMT sections of the Tax Code and such resulting NOLs can be utilized to fully offset the corporation's AMTI (determined prior to the NOL deduction). However, COD income that is excluded from taxable income under the rules discussed above similarly is excluded from AMTI.

### 19.2.    Tax Consequences to Creditors

### 19.2.1. Generally

The tax consequence to any particular creditor may vary depending on their own circumstances and they should consult with their own tax professional for advice regarding the impact on them of their acceptance or rejection of the plan.

### 19.2.2. Members of Dissolved Partnerships

The Plan calls for the dissolution of Partnerships.  This will result in certain tax consequences which are different for every member of each Partnership.  For instance, if a partner has a negative capital account as a result of asset depreciation, there may be no tax consequences. If, however, a partner has a negative capital account as a result of a failure to pay original paid-in

capital, then when the account is brought to zero there may be imputed income.  Likewise, if a partner has a positive capital account which is brought to zero by dissolution, then there may be an imputed loss.  Each partner may be subject to some losses or gains as a result of their individual relationships with the partnerships, the partnership assets and liabilities, and the tax treatment applicable for each.  Accordingly, it is important that all limited partners of each Partnership determine the effect of dissolution on their interests.

### 19.2.3. Unsecured Claims

Holders of Class 3 Unsecured Claims will receive distributions from the Debtor.  A Class 3 Claimholder should either be treated as (i) recognizing ordinary income in an amount equal to cash received and recognizing a loss in an amount equal to the tax basis in the Claim or (ii) recognizing a loss equal to the difference between the amount of cash received and their tax basis in their Claim.

A Claimholder's tax basis in a Claim should generally equal the amount included in income as a result of the provision of goods or services to the Debtor, except to the extent that a bad debt loss had previously been claimed. The gain or loss with respect to the Claim should be ordinary to the extent that it arose in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtor.

**DUE TO THE COMPLEX NATURE OF APPLICABLE TAX LAWS, CLAIMANTS SHOULD CONSULT WITH THEIR TAX PROFESSIONAL CONCERNING COMPLIANCE WITH AND THE AFFECT OF BOTH STATE AND FEDERAL TAX LAWS ON THEIR INTEREST BEFORE THEY CAST A BALLOT TO ACCEPT OR REJECT THE PLAN.**

**THE ACCOUNTANTS, ATTORNEYS, AND THE MANAGEMENT OF GOCO MAKE NO REPRESENTATIONS HEREIN CONCERNING THE IMPACT OF THE TAX LAW ON ANY INDIVIDUAL TREATED UNDER THE PLAN.**

DATED: April 22, 2004

Respectfully submitted,


__/s/ by permission HMR_____
**Ralph T. McElvenny, President**
**Golden Oil Company**

0336385.DOC
4/22/04:0336385.DOC